Whitakee, Judge,
delivered the opinion of the court: ■
Plaintiff sues to recover just compensation for the taking of twelve acres of his land. He alleges that in the construction of a road along the historic Natchez Trace Parkway, running from Nashville, Tennessee, to Natchez, Mississippi, the defendant diverted the natural flow of the surface water, with the result that plaintiff’s cultivated field bordering the parkway was inundated and eroded.
Plaintiff’s land is located in Webster County, Mississippi, and is bisected by the Natchez Trace Parkway, created by an act of Congress on May 18, 1938, and administered by the National Park Service. Due to the nature of the topography, it was necessary to construct the parkway road on an earthen embankment approximately six feet in height. In order to take care of the natural drainage of the adjacent lands, which was from the northeast to the southwest, the defendant placed large culverts beneath the parkway and also beneath a small service road to the east, which runs parallel to the parkway at this point. One of these culverts was directly adjacent to the twelve acres in question. This culvert carried the water which drained from the east through another large culvert located under the parkway.
These culverts were installed at points determined by the defendant to be the lowest points at which the natural drainage would cross the parkway and the service road in this immediate vicinity. From the culverts the water emptied into an old slough to the east of plaintiff’s land alleged to have been damaged, which defendant widened and deepened.
Plaintiff’s land is bottom land and poorly drained. Moore’s Creek meanders through it and empties into Big Black River immediately west of plaintiff’s land. The topsoil on plaintiff’s land is about three feet thick, but is under-laid by impervious clay. Neither the creek nor the river is able to promptly carry off the rainfall. As a result, in periods of heavy rainfall the water stands on the land, and *756 the soil in some years remains soaked for long periods of time.
The standing water comes from several sources, from rain falling directly upon the land, from surface water discharged upon the field through the culverts, from the overflow from Moore’s Creek to the west, and surface water draining from the land to the north.
Plaintiff was unable to prove that defendant’s location of the culverts changed the course or increased the natural drainage from the east. However, the defendant, by the use of culverts, concentrated the surface water from the east so that it emptied on plaintiff’s land at one point rather than many. This concentration caused the water to be discharged at a higher velocity than before, and caused it to stand at a greater depth than before. The old slough which defendant widened and deepened, and which plaintiff further widened and deepened, cannot carry the water flowing out of the culverts during periods of heavy rainfall; and, consequently, the overflow has eroded about eight inches of topsoil in an area approximately 75 feet long and 50 feet wide within the 12-acre tract in question. The concentration of the drainage from the east through these culverts has directly contributed to this erosion, and has decreased the value of plaintiff’s land, for which plaintiff is entitled to recover. Cotton Land Company v. United States, 109 C. Cls. 816.
The trial commissioner, from a review of the evidence as a whole, found that the market value of plaintiff’s farm has been reduced by the sum of $600 as a result of defendant’s action. We concur in this finding.
Judgment will be entered in plaintiff’s favor in this amount, plus 4 per cent thereon from the date of taking on December 18, 1956, to the date of payment, with the right in the defendant to continue to discharge natural drainage waters through the culverts under the parkway road and the service road to the east and onto plaintiff’s twelve-acre tract.
It is so ordered.
LittuetoN, Judge, (Bet.); Laeamobe, Judge; Madden, Judge, and Jones, Chief Judge, concur.
*757 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. The Natchez Trace Parkway was created by an act of Congress on May 18, 1938, and is administered by the Secretary of the Interior through the National Park Service. It follows fairly closely the route of the historic Natchez Trace between Nashville, Tennessee, and Natchez, Mississippi, in a generally southwesterly direction, a distance of approximately 450 miles of which approximately 316 miles are in the State of Mississippi. The parkway road is located, designed and constructed jointly by the Bureau of Public Boads and the National Park Service. The Bureau handles the engineering and construction phases while the Park Service provides the landscape and architectural plans and supervision.
2. Plaintiff is a resident citizen of Webster County, Mississippi. Since December 2, 1947, plaintiff has owned 95 acres of land adjoining the Natchez Trace Parkway. The land involved in this action consists of 55 acres lying on the west side of the parkway and is described as the north half of the southwest quarter of Section 14, Township 20 South, Bange 11 East, Chickasaw Meridian, Webster County, Mississippi, less the easterly 25 acres thereof taken for the parkway. The State of Mississippi acquired the 25 acres referred to on January 3, 1941, from plaintiff’s immediate predecessor in title and conveyed the land to the defendant by deed of gift dated June 23,1952.
Plaintiff also owns 20 acres of farmland south of the land in suit and 20 acres adjoining the parkway on the east side thereof, but those portions of his farm are not involved in this action.
3. In the vicinity of plaintiff’s land, the parkway is approximately 700 feet in width where it meets the north line of plaintiff’s land and about 780 feet wide at the south line of plaintiff’s land. The parkway road constructed by the defendant in 1956 runs in a generally north-south direction through the approximate center of the parkway lands.
*758 4. Sometime prior to December 18, 1956, the defendant began work on a project in the vicinity of plaintiff’s land. The project work included the construction of the parkway road over an area of about 9,000 feet long and the building of a service road, plus necessary grading and drainage for these facilities. Plaintiff’s land lying west of the Natchez Trace Parkway is located approximately in the center of the area covered by the project. The land through which the parkway courses in the vicinity of plaintiff’s land is hilly in character. On the eastern edge of the parkway property, the elevations reach 445' feet. The elevation of the terrain decreases sharply toward the west. At the point where the western line of the parkway meets the northeast corner of plaintiff’s land west of the parkway, the elevation is approximately 406.3 feet. The elevation of plaintiff’s field adjoining the parkway property gradually reduces in elevation from north to south until it reaches about 402.6 feet near the south line of his farm. The distance between the two elevations is about 1,320 feet. Although the topography of the land in suit varies, the general direction of natural drainage on the 55 acres is from the northern to the southern portion, where most of the tract is covered by trees.
When the land was surveyed for the project, the defendant’s engineers decided it would be out of the question to construct a bridge for the parkway road across the entire length of the low bottom land. Consequently, defendant constructed an embankment for the parkway road over the area mentioned. The height of the fill varies, but its elevation at station 729 is approximately 411 feet or about 4 feet above the pre-existing elevation.
In order to provide the owners having land on both sides of the parkway with access to their properties, the defendant also constructed a service road extending from a state highway east of the parkway. The service road crosses the parkway and passes under the parkway road through an underpass built by the defendant for that purpose. At a point about 200 feet north of the north line of the land in suit, the service road makes a right angle turn to the south and runs approximately parallel to plaintiff’s farm at a distance of about 20 feet therefrom. Plaintiff’s residence *759 and farm buildings are located on land east of the parkway, and he reaches his farm on the west side of the parkway via the service road. The road is now maintained by the county. Although the service road lies at a lower elevation than the parkway road, the defendant also constructed a fill for the .road, which at station 10 thereon is at a height of 3 or 4 feet above the pre-existing grade. The area lying between the west line of the parkway road and the west line of the parkway property, a distance of from 275 feet to 300 feet, is very flat and the greater portion of that area has an elevation of 405 feet or less. Both the parkway road embankment and the service road fill serve to impound the surface waters that drain over a large area from the higher terrain east of the parkway road and thus afford some protection to the lands west of the parkway.
The defendant’s project was completed about December 13, 1956, and the parties have agreed that if any of plaintiff’s property was taken by defendant, December 13, 1956 was the date of the taking.
5. In connection with the construction of the parkway road and the service road, it was necessary for defendant to construct facilities to carry under the parkway road the surface water that came from higher lands to the east. After the grade structures had been located on the ground, the defendant’s project engineer observed that the natural drainage from the east was crossing the location of the parkway road at station 729, which is approximately 200 feet north of the south line of plaintiff’s 55-acre tract on the west side of the parkway. After a topographic survey was made, the project engineer found that the lowest point at which the natural drainage crossed the area laid out for the parkway road was at station 729, and he therefore decided that twin 48-inch culverts should be installed at the base of the parkway road at that point for carrying away the water that drained from the east. Defendant’s engineer also located an old ditch or slough which ran in a westerly direction from the eastern edge of the parkway property for a distance of about 200 feet. At a point of about 200 feet east of station 729, the slough or ditch turned in a slightly northerly direction. The ditch or slough continued in a northerly direction *760 west of the parkway road and terminated at station 10 of the service road. At that point, another set of two 48-inch culverts were placed by defendant under the service road. The outlet elevation of the twin culverts the defendant placed at the base of the parkway road is 404.73, and the elevation at the outlet of the two culverts installed at the base of the service road is 403.60. The twin culverts passing beneath the service road were located at a point of about 800 feet south of the northeast corner of plaintiff’s 55-acre tract and about 20 feet east of plaintiff’s adjoining field. In order to enable the ditch to carry a larger volume of drainage water, the defendant widened the old ditch or slough and at the point where the two culverts were placed underneath the service road, the ditch was made about 10 feet wide.
6. In 1947 when plaintiff acquired the 55 acres of land lying west of the parkway property, approximately 14 acres were in cultivation and the remainder was in woodland. In the fall of 1953, plaintiff began clearing an additional 12 acres lying immediately adjacent to the parkway property. He finished clearing the 12 acres in the spring of 1954 and raised a good corn crop on the land that year. The 12-acre plot is the most productive and valuable part of the 55-acre tract. Approximately 29 acres of the 55 acres are woodland, the greater portion of which is located in the southern part of the tract and lies at a lower elevation than any other part of plaintiff’s farm.
7. Plaintiff’s 55-acre tract of land is bottom land. The topsoil on the 26 acres in cultivation is from 30 to 36 inches in depth. The soil is of high fertility but is low in organic content. The soil underlying the topsoil is very impervious. As a result, the topsoil stays moist for long periods of time after heavy rainfall or after the land is overflowed. In dry years or when the land can be dried out through proper drainage, the cultivated land will produce a record crop, but in wet years the crops on such bottom lands are below average.
In 1955, plaintiff ha,d 6.7 acres of the 12-acre plot adjoining the parkway property planted to cotton and produced 12 bales of cotton on such land that year. He also had an excellent corn crop on the same plot in 1955. 1955 was a year *761 of relatively low rainfall and was also a record year for both, corn and cotton production in Webster County, Mississippi.
The evidence does not show what crops plaintiff raised on the 26 acres of cultivated land in 1956, but in 1957 he had a complete crop failure. In that year, his farm and other bottom land, in the same area were overflowed to the extent that there was little or no crop production. Also in that year, the average yield of cotton in Webster County was the lowest in the period from 1951 through 1957. In 1958, plaintiff raised a good crop of com and sorghum on the same land. His cotton crop on the 12 acres was planted late, but as of October 1, 1958, it was estimated that the yield would be approximately one-quarter of a bale to the acre.
8. The western edge of plaintiff’s 55-acre tract of land is traversed by the Big Black River, a meandering stream varying between 45 feet and 60 feet in width and from 8 feet to 16 feet in depth. Its meandering course across plaintiff’s land forms three oxbow peninsulas. The Big Black River flows generally to the south. East of the river and roughly bisecting the 55-acre tract is Moore’s Creek, a small stream which flows from the northeast to the southwest where it empties into the Big Black River. The creek makes innumerable turns as it courses across plaintiff’s property. The channels of Moore’s Creek and the Big Black River are inadequate to drain their watersheds and they periodically overflow after heavy rainfall in the area.
9. Prior to the time plaintiff acquired his land and before work on defendant’s project started, the land now owned by plaintiff was inundated after periods of heavy precipitation.
In an effort to drain his cultivated land and to direct the overflow of surface water to the wooded area lying in the southern portion of his farm, plaintiff dug a number of ditches. He laid out a drainage ditch along the north line of his land and dug other ditches in his field to channel water toward the . wooded area, the direction of natural drainage. He also dug a drainage ditch along the east line of his field bordering the parkway property. In the vicinity of the wooded area, this ditch turns in a westerly direction and empties into the wooded area. "While the service road was under construction, the ditch was widened by defend *762 ant’s contractor with plaintiff’s permission. Seven hundred cubic yards of soil were removed from the ditch by the contractor and used as a subgrade for the service road. This ditch was further improved by plaintiff during the winter of 1957-1958 and is now about 6 feet wide and 4 feet deep at the point opposite the twin culverts under the service road.
10. Plaintiff contends that prior to December 13,1956, the natural drainage from the high land east of the parkway was from the northeast to the southwest into the woods on the southern portion of his farm; that the defendant has diverted the course of the natural drainage in a northerly direction and has discharged the impounded water through the road culverts upon his farm in such a manner as to completely ruin the 12-acre plot, damage his adjoining land, and wash out crops planted on the 26 acres in cultivation.
11. The evidence shows that after heavy precipitation, a considerable portion of plaintiff’s cultivated land is flooded, but plaintiff has failed to establish by a preponderance of the evidence that the flooding of his land is due entirely or principally to the acts of the defendant. Since plaintiff acquired the land, very little, if any, of the overflow from the Big Black Biver has flooded his 12-acre plot. The water that has been standing or flowing upon the 12 acres of land since the completion of defendant’s project has several sources including rain falling directly upon the land, surface water impounded by defendant and discharged upon the field through the twin culverts, the overflow from Moore’s Creek, and surface water draining from the land to the north of the 12-acre plot.
12. The evidence does not establish that defendant has caused a greater quantity of water to flow upon plaintiff’s land from the higher terrain to the east. However, before the defendant constructed the project facilities, the water draining upon plaintiff’s land from the east was spread out over a wide area and was shallow in depth so that there was little, if any, visible erosion or other permanent damage to the land. As a result of the roadway embankments erected by the defendant, the surface water flowing westward has been concentrated at one point and is being discharged upon plaintiff’s 12-acre plot through the two sets of culverts at a *763 greater depth and a higher velocity than under the former natural drainage conditions. Since the drainage ditch running along the east line of the farm cannot carry the water flowing out of the culverts during periods of heavy rainfall,the overflow from the ditch has been scouring or eroding the soil on the 12-acre plot. The evidence is in sharp conflict as to the extent of the damage to the land, but as of October 1, 1958, 8 inches, of topsoil had been eroded in an area 75 feet long by 50 feet wide as a result of the water discharged upon the 12 acres through defendant’s culverts. The overflow water from the ditch runs westward into plaintiff’s field for a distance of about 200 feet, courses southward for 300 feet, and then empties into the drainage ditch. Since the topsoil is from 30 to 36 inches deep, crops can still be planted on the eroded land, but the plants may be washed out by the force of the water overflowing the ditch.
13. The record does not show the amount of the acreage that eventually may be damaged or the time that will be required for the erosion of all of the topsoil thereon. The damage is of a continuing character, and the extent of the erosion in the future will depend on the amount of rainfall in the area and the quantity and velocity of the water overflowing the ditch. In view of these facts, the amount by which the market value of plaintiff’s farm has been impaired cannot be determined with mathematical exactness. From a review of the evidence as a whole, however, it is found that the market value of plaintiff’s farm has been reduced by the sum of $600 as a result of the work completed on defendant’s project on December 13,1956.
14. Plaintiff has failed to establish the amount of crop loss, if any, that he has sustained as a proximate cause of the facilities constructed by the defendant.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is, therefore, adjudged and ordered that he recover of and from the United States six hundred dollars ($600), plus four (4) per cent thereon from the date of taking on De *764 cember 13,1956, to the date of payment, subject to the right in the defendant to continue to discharge natural drainage waters through the culverts under the parkway road and the service road to the east and onto plaintiff’s twelve-acre tract.