## COTTON LAND CO. et al. v. UNITED STATES.
### No. 46422.

Court of Claims.
Jan. 5, 1948.

Leonard A. Diether, of Los Angeles, Cal. (Binford & Binford and Cosgrove, Clayton, Cramer & Diether, all of Los Angeles, Cal., on the brief), for plaintiffs.

Marvin J. Sonosky, of Washington, D. C., and A. Devitt Vanech, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

MADDEN, Judge.

This is a suit by Cotton Land Company, a corporation in liquidation, and several of its stockholders for compensation for land which, the plaintiffs say, the Government has taken from the company by its construction and operation of Parker Dam.

The Company owns some 12,000 acres of land in the Mohave Valley in Arizona. The Colorado River flows through that valley, forming there the common boundary between Arizona and California. The company's land is about midway in the length of the valley, and its northerly line is 86 miles south of Hoover Dam. Its southerly line is 53.4 miles north of Parker Dam. The land does not lie in a block, but is made up of alternate sections. The total distance from the north line to the south line of the land is about 16 miles, hence its total river frontage, made up of the western boundaries of such of its alternate sections as reach to the river, is about eight miles. The lands extend back from the river to the east to distances varying from 1 to 5½ miles. The city of Needles, California, lies on the west bank of the river opposite the south 2 or 3 miles of the land. The settlement of Topock, Arizona, is 10 miles down the river toward Parker Dam from the southern line of the company's land.

Parker Dam was constructed and is operated by the Government under authority of law for the purposes stated in the Act of August 30, 1935, 49 Stat. 1039. Hoover Dam which, as we have said is about 86 miles up the river from the north line of the company's land commenced impounding water in February 1935, forming a reservoir known as Lake Mead. Parker Dam, 53.4 miles south of the south line of the land, commenced impounding water in its reservoir, Lake Havasu, on October 16, 1938, and within a month the level of the lake was at elevation 440 above sea level. This level was maintained until 1942 when the lake elevation began to be raised. In April 1943 it reached 450.54, the height of the crest of Parker Dam. The pool of the dam then extended upstream to a point 5 to 6 miles above Topock, or 4 to 5 miles south of the southern line of the company's land. The cross-sectional area of the river, now the lake, above Topock has been increased about 50 percent. The river, upon flowing into the lake, lost its velocity and

dropped the large quantities of sand and smaller quantities of silt and clay which it had scoured out of its bed in the canyon below Hoover Dam. This deposition of sand began early in 1939 and has progressed upstream since that time. It reached Needles in 1939, and has since reached a point 22 miles above Topock, that is, within some 4 miles of the north line of the company's land. This placing of sand in the river bed has raised the elevation of the river bed 9 feet at a point about 3 miles above Topock, and 4 feet at Needles, thence tapering off to zero at the point referred to above, 22 miles north of Topock. There was, of course, a corresponding rise in the level of the water surface in the river, except as it overflowed its banks. The deposit in the bed of the river just above Topock had the characteristics of a typical delta. The rise of the bed and water surface of the river caused it to overflow its banks, and this tendency progressed up the river. By December 1941, from a point about 19 miles above Needles down to the beginning of Lake Havasu, a large part of the flow of the river was, when the release of water from Hoover Dam was relatively high, leaving the channel and flowing across portions of the company's lands to the east, flooding or isolating them. The raising of the surface of the water in the river also caused water to back up through several sloughs on the southern portion of the company's land. The consequence of the overflowing and the backing up of water is that those portions of the company's land which lie below approximately elevation 468 have been flooded or isolated since about the end of 1940 and will continue to be so flooded or isolated. The acreage flooded was stipulated by the parties to be some 7,000 acres, and the acreage isolated about 2,000 acres. Apparently this stipulation will not prevent the parties from proving acreages different from these, if it is decided that the Government is required to compensate the plaintiffs.

If the construction of Parker Dam and the impounding of water behind it had included some of the company's land within the bed of the lake and had isolated other parts of its land, making it worthless, there would be a plain case of taking, and the Government would have to pay compensation. Here, however, the flooding and isolation of the land did not result so directly from the Government work as in the situation just described. Here the dam was built and the pool was filled, no harm resulting to the company's land. But a succession of events was initiated which, when the events had all occurred in their natural order, deprived the company of the beneficial use of its land. The river flowed into the lake; deposited its sand where it collided with the still water; the deposit of the sand placed another obstacle to the full and rapid flow of the river; this filling up of the bed of the river raised the level of its water; it overflowed its banks, they being low, and spread out over the company's land, it being still lower.

The Government has built its desired public improvement; the company has lost its land. Does the provision of the Constitution that private property shall not be taken for public use without just compensation require that the Government pay for the land? The Government urges that where the owner's loss can be traced to the Government's act only through such a chain of events as occurred in this case, the loss is consequential and, therefore, not compensable. There are, of course, many cases in which the courts have held that, on the facts presented, the Government was not obligated to pay compensation, the relation between the Government's act and the plaintiff's loss being said to be too remote, or the plaintiff's loss being called consequential. The concept, in the law, of nonliability because of the remoteness of the act from its consequences is necessarily vague. In the law of torts, the remoteness is usually produced by some unforeseeable or so-called intervening cause, which is said to break the chain of legal connection between the defendant's act and the plaintiff's loss. By that test, the company's loss in this case was not legally remote. The events which occurred, although they took some time, were only the natural consequences of the collision of sediment-bearing flowing water with still water, and the progress upstream, of the deposit begun by that collision. If engineers had studied the question in advance they would, we sup-

pose, have predicted what occurred. If they had studied the question in advance and had said, in a report, "If you build Parker Dam to a crest of 450.4 feet, the pool will cover the land described below. The effect of the flow of the river into the pool will be to form a delta which, within approximately three years will raise the bed and the surface of the river, will cause it to overflow its banks and will thus inundate the lands described below," would the fact of that formal forewarning be a decisive fact in such a suit as this? Should the fact that the engineering study was not so complete as to include a prediction as to lands beyond the bed of the reservoir prevent a court from looking at the actual and natural consequence of the Government's act?

We think that the tendency in some cases to find remoteness may have resulted from confusion with regard to the extent to which the Government has, by statute, consented to be sued. Section 145 of the Judicial Code, 28 U.S.C.A. § 250, says:

"Claims against United States. First. All claims (except for pensions) founded upon the Constitution of the United States or any law of Congress, upon any regulation of an executive department, upon any contract, express or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty if the United States were suable: * * *."

The discussion, in United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 359, 47 L.Ed. 539, in the majority and concurring opinions, as to whether the Tucker Act gave consent for the United States to be sued upon any claim "founded upon the Constitution," or only upon claims so founded "not sounding in tort," poses the problem. In Tempel v. United States, 248 U.S. 121, 39 S.Ct. 56, 63 L.Ed. 162, the court unanimously applied the latter view. And in United States v. North American Transportation & Trading Co., 253 U.S. 330, 40 S.Ct. 518, 520, 64 L.Ed. 935, the court refused to allow a plaintiff, in a suit for lands taken, to recover interest as a part of just compensation, holding that the suit was "not founded upon the Fifth Amendment" but was "an action of contract to recover money which the United States is assumed to have promised to pay," and that, therefore, the allowance of interest was forbidden by Section 177 of the Judicial Code, 28 U.S.C.A. § 284.

But in later cases the construction of the Tucker Act seems to be different. In Jacobs v. United States, 290 U.S. 13, 54 S.Ct. 26, 27, 78 L.Ed. 142, 96 A.L.R. 1, the lower court had denied the plaintiff interest in a suit brought by him for the taking by the United States of an interest in his land. The Supreme Court reversed and allowed interest, saying of the fact that the United States did not bring eminent domain proceedings, but the plaintiff was suing for compensation:

"The form of the remedy did not qualify the right. It rested upon the Fifth Amendment. Statutory recognition was not necessary. A promise to pay was not necessary. Such a promise was implied because of the duty to pay imposed by the Amendment. The suits were thus founded upon the Constitution of the United States."

And the court commented on the North American Co. case, supra, as follows:

"The court said that the suit was not founded upon the Fifth Amendment. 253 U.S. pages 334, 335, 40 S.Ct. 518, [520,] 64 L.Ed. 935. Suits brought to enforce the constitutional right to just compensation are governed by the later decisions which are directly in point."

It is plain that the court's statement in the Jacobs case, quoted above, about a promise being implied meant only that a legal duty had arisen, not that a contract express, or implied in fact, such as is necessary to give jurisdiction under the Tucker Act when no constitutional or statutory right is involved, was present. See Alabama v. United States, 282 U.S. 502, 51 S.Ct. 225, 75 L.Ed. 492.

In Yearsley, et al. v. W. A. Ross. Const. Co., 309 U.S. 18 at page 22, 60 S.Ct. 413, at page 415, 84 L.Ed. 554, the court said:

"So, in the case of a taking by the Government of private property for public use such as petitioners allege here, it cannot be doubted that the remedy to obtain compen-

sation from the Government is as comprehensive as the requirement of the Constitution, * * *."

In United States v. Causby, 328 U.S. 256, at page 267, 66 S.Ct. 1062, at pages 1068, 1069, 90 L.Ed. 1206, where the Government regularly flew its planes over the plaintiff's land at a low altitude and he sued for compensation for the interest, in the nature of an easement over his land, which he asserted was thus taken, the court said:

"We need not decide whether repeated trespasses might give rise to an implied contract. Cf. Portsmouth Harbor Land & Hotel Co. v. United States, [260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287]. If there is a taking, the claim is 'founded upon the Constitution,' and within the jurisdiction of the Court of Claims to hear and determine. See Hollister v. Benedict & Burnham Mfg. Co., 113 U.S. 59, 67, 5 S.Ct. 717, 721, 28 L.Ed. 901; Hurley v. Kincaid, 285 U.S. 95, 104, 52 S.Ct. 267, 269, 76 L.Ed. 637; Yearsley v. W. A. Ross Const. Co., 309 U.S. 18, 21, 60 S.Ct. 413, 415, 84 L.Ed. 554. Thus, the jurisdiction of the Court of Claims in this case is clear.

In United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 1384, the court after referring to the Lynah and Tempel cases, supra, said, of the case before it:

"But whether the theory of these suits be that there was a taking under the Fifth Amendment, and that therefore the Tucker Act may be invoked because it is a claim founded upon the Constitution, or that there was an implied promise by the Government to pay for it, is immaterial. In either event, the claim traces back to the prohibition of the Fifth Amendment, 'nor shall private property be taken for public use, without just compensation.'"

We think that, in view of the decisions and expressions referred to above, it is not necessary, in order to take jurisdiction of a suit for compensation for property taken, to find that the Government's agents were aware that their acts would result in its taking, so that their performance of the acts can be regarded as a somewhat tenuous promise to pay.

We find no very exact analogy in the cases for the physical situation which this case presents. One which is comparable is that of Jacobs v. United States, supra, as the facts appear in the lower court's decision. 5 Cir., 45 F.2d 34. There the Government built its dam. The plaintiff's land lay upstream, and was 14 feet higher than the crest of the dam and the level of the reservoir. The land had always been subject to intermittent floods, but after the completion of the dam, and, presumably, because of the retarding effect of the still water upon the flow of the stream, it was somewhat more frequently subjected to intermittent floods after the dam was built. The plaintiff recovered in the lower courts. Only the question of interest was presented to the Supreme Court, hence that court cannot be regarded as having expressly approved the decision that the facts presented a case of a taking, within the meaning of the constitution. It is apparent that the instant case, in which the land in question has been permanently flooded or isolated, is stronger for the plaintiff than the Jacobs case.

As we have said, the Government built its public improvement. The plaintiffs lost their land. The loss resulted naturally from the improvement. We hold that the plaintiffs are entitled, under the Constitution, to be compensated. The amount of their compensation will be determined at a further hearing before Commissioner Foster, to whom the case is now referred.

It is so ordered.