# United States Court of Appeals for the Federal Circuit

2008-5022

RICHARD CARY, SUSAN CARY, PATRICIA GEERTS,
SHARON HENRY, JAMES HERZOG, DIANE KNUEFFER,
PATRICIA MARTIN, ROBERT S. MARTIN, JANET MARIE PRIATT,
DONA SCHNEIDER, DOUGLAS SCHWAEBE,
CARL SCHWEIKERT, KATHERINE SCHWEIKERT,
DAVID SOUTHCOTT, and MARY CAROL WILDER, on behalf of themselves
and all others similarly situated,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Mark S. Grotefeld, Grotefeld & Hoffmann, LLP, of Chicago, Illinois, argued for plaintiffs-appellants. With him on the brief were Todd C. Harshman and Waylon J. Pickett, of San Francisco, California.

Katherine W. Hazard, Attorney, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Ronald J. Tenpas, Assistant Attorney General, and Katherine J. Barton and Marc A. Smith, Attorneys.

Appealed from: United States Court of Federal Claims

Senior Judge John P. Wiese

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

2008-5022

RICHARD CARY, SUSAN CARY, PATRICIA GEERTS,
SHARON HENRY, JAMES HERZOG, DIANE KNUEFFER,
PATRICIA MARTIN, ROBERT S. MARTIN, JANET MARIE PRIATT,
DONA SCHNEIDER, DOUGLAS SCHWAEBE,
CARL SCHWEIKERT, KATHERINE SCHWEIKERT,
DAVID SOUTHCOTT, and MARY CAROL WILDER, on behalf of themselves
and all others similarly situated,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  January 16, 2009
_____

Before MAYER, LINN, and MOORE, Circuit Judges.

MAYER, Circuit Judge.

Richard Cary, et al., ("landowners") appeal the judgment of the United States
Court of Federal Claims denying their claims against the United States for the taking of

their property without just compensation by inverse condemnation in the 2003 California "Cedar Fire." Cary v. United States, 79 Fed. Cl. 145 (2007). Because the landowners have not stated a claim for which relief may be granted, we affirm.

BACKGROUND

The landowners are aggrieved owners of properties neighboring the Cleveland National Forest ("CNF"), near San Diego, California. On October 25, 2003, a deer hunter lost in the forest lit a signal fire to aid his rescue. Named the Cedar Fire, the fire spread and became one of the largest conflagrations in California history. The fire claimed the lives of fifteen people, and consumed more than 273,000 acres of land, 2,232 residences, twenty-two commercial structures, and 566 outbuildings. The landowners' properties were in the burned area.

Fires are an unavoidable fact of life in Southern California, where they frequently and predictably occur during a "fire season." The area including the CNF is so prone to fire that its fire season is year-round, with Santa Ana winds exacerbating the likelihood and intensity of fires between September and December. It is believed that fires have occurred seasonally in the CNF since before humans lived in North America. According to the landowners, early fires were frequent, but of low-intensity, burning out without intervention. Beginning in 1911, the United States Forest Service implemented a policy to suppress all fires in the CNF, originally to protect timber and water reserves. Today such reasons include protecting natural resources, air quality, and endangered species, and for public recreation.

In 1968, the Forest Service ended its policy of mandatory suppression of fires, and replaced it with a policy of selective suppression, allowing fires to run their natural

course under prescribed conditions, such as occurring late in the fire season. Within a few years, the Forest Service recognized that some places in the Southern California fire zone, including the CNF, were sustaining particularly high fuel loads which posed a greater risk for conflagration, and implemented policies called "fuel modification" which were designed to clear and thin flammable vegetation and lower the risk of conflagration. The Forest Service conducted prescribed burns in the CNF to lower the risk of fire, although they were prevented from using prescribed burns in some areas because of such obstacles as riparian area or endangered species protection.

In 2003, the year of the Cedar Fire, 97% of fires were extinguished within twenty-four hours of their discovery. This near total suppression of fires, the landowners allege, altered the "fire ecology" of the CNF by disrupting the natural, frequent, low-intensity fires. They argue that low-intensity fires consumed the underbrush and other flammable vegetation in the forest, and so the suppression of fires allowed the vegetation to accumulate into unnaturally thick stands of trees and underbrush. Any fire in the CNF, if not immediately controlled, would become a devastating firestorm, and on October 25, 2003, the lost hunter illegally set such a fire. Because it occurred late in the day, fire crews were prevented from reaching it immediately in light of Forest Service policy which prohibited firefighting after sunset. By the next day, it had become a major conflagration and eventually consumed the landowners' properties.

The landowners filed suit in the United States Court of Federal Claims on behalf of themselves and all others similarly situated who sustained damage to a property interest as a result of the fire. They accused the Forest Service of taking the known calculated risk that its land management policies in the CNF would result in a taking of

adjacent landowners' property in the event of a fire originating in the CNF that spread outside its boundaries. Thus, they alleged that the United States took their property by inverse condemnation without just compensation.

The government moved for judgment on the pleadings because the landowners failed to allege facts showing that the Forest Service management policies in the CNF effected a compensable taking of their property for public use under the Fifth Amendment. It argued that the fire was caused by a lost hunter illegally setting a fire, not government policy. The court entered judgment for the government: "Our difficulty is not with the foreseeability of the harm plaintiffs suffered, but with the cause of the harm." Cary, 79 Fed. Cl. at 148. The court further stated that unless the hunter was acting as its agent, causation could not be attributed to the government. Id. The landowners appealed.

## DISCUSSION

When reviewing appeals in which the Court of Federal Claims entered judgment on the pleadings pursuant to its Rule 12(c), we apply the same standard of review as a case dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and review the judgment de novo. See Chang v. United States, 859 F.2d 893, 894 (Fed. Cir. 1988). We must presume that the facts are as alleged in the complaint, and make all reasonable inferences in favor of the plaintiff. Gould Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991). To state a claim, the complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing of entitlement to relief. See Bell Atlantic Corp. v. Twombley, 550 U.S. 544, ___, 127 S. Ct. 1955, 1966 (2007). The factual allegations must be enough to raise a right to relief above the speculative level.

Id. at 1965. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face. Id. at 1974. The landowners also must prove subject matter jurisdiction. Mars Inc. v. Kabushiki-Kaisha Nippon Conlux, 24 F.3d 1368, 1372 (Fed. Cir. 1994).

Whether a taking under the Fifth Amendment has occurred is a question of law with factual underpinnings. Alves v. United States, 133 F.3d 1454, 1456 (Fed. Cir. 1998). Therefore, we review the determination of law de novo, while in this case the facts must be accepted as alleged.

The landowners placed the liability of the United States under the Tucker Act, which grants the Court of Federal Claims jurisdiction over claims for money damages "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000); United States v. Mitchell, 463 U.S. 206, 216 (1983). We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

The Fifth Amendment to the United States Constitution provides in part that "private property [shall not] be taken for public use, without just compensation." Because the government conducted no formal exercise of eminent domain, this case is for alleged "inverse condemnation." See Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir. 2005). Inverse condemnation is "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." Id. (quoting United States v. Clarke, 445 U.S 253, 257 (1980)) (quotation marks omitted).

The landowners rely on an analogy between the fires here and flooding in cases typified by Ridge Line, Inc. v. United States, 346 F.3d 1346 (Fed. Cir. 2003), which set out a two part test that can be characterized as causation and appropriation. In the causation prong, it must be shown that "the government intend[ed] to invade a protected property interest or [that] the asserted invasion [was] the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." 346 F.3d at 1355 (citation removed). The landowners allege that two Forest Service policies constituted the authorized activities that caused the Cedar Fire. First, they cite the circa 1911 policy of suppressing all forest fires in the CNF and the nearly century long suppression of all or nearly all fires, instead of allowing them to consume the accumulated fuel load in the forest. Second, they cite the policy of allowing human visitors to enter the forest for recreational purposes. The fire, they say, was the direct, natural, probable result of these policies.

To prevail the landowners must first show that the government intended to invade a protected property interest. Clearly, the government did not intend to take the landowners' land by use of an uncontrolled wildfire, and they do not allege that it did. Instead, they say that because they did "not allege that the government intentionally appropriated [their] property" the trial court can infer intent if the asserted injuries were "the direct, natural, or probable result of the [authorized government action], rather than merely an incidental or consequential injury." Ridge Line, 346 F.3d at 1356. They also point out that "an inverse condemnation plaintiff must prove that the government should have predicted or foreseen the resulting injury." Moden, 404 F.3d at 1343 (Fed. Cir. 2005). Moden clarified the meaning of "direct, natural, or probable result" to mean that

the injury must be the likely result of the act, not that the act was the likely cause of the injury, the latter allowing for incidental injuries resulting from a true cause-in-fact to be considered a taking. Id. (requiring plaintiffs to present evidence that the contamination of their ranch was the likely, foreseeable result of the authorized use of a chemical on a nearby military installation). Therefore, to survive judgment on the pleadings, the landowners must plausibly show that the consumption of their property by fire was the likely, foreseeable result of Forest Service action.

Their complaint alleges that the government created a risk that wildfires would spread to neighboring properties through its policies. The government "was or should have been aware that its land management policies as they related to fire suppression and prevention for the CNF created a significant risk that a wildfire originating in the CNF and fueled by the buildup of highly flammable vegetation in the CNF would spread to adjacent landowners' properties." They similarly pleaded that the government took the calculated risk that a recreational user would start a fire, would do so during the extreme fire conditions of October 2003, and that the fire would likely become a wildfire resulting in the taking of property adjacent to the forest. Accepting arguendo that a policy is an action,[*] in charging the government with increasing the risk of a conflagration that would spread to neighboring properties, the landowners appear to have reversed the Moden rule, alleging that the policies were the likely cause of the loss of their property. At a minimum, they have not pleaded that the loss of property would

---

[*] The "policy" is not one authorized action but a set of intertwined, authorized actions. The landowners cherry-pick parts of the Forest Service policy which they argue have increased the risk of wildfire since 1911 without acknowledging that much of the Forest Service policy over the last century has been devoted to reducing the risk of wildfire by controlling the same fuel loads the landowners allege have been allowed to accumulate.

be the likely, foreseeable result of a policy of fire suppression and recreational use, but merely that the government knew of or increased a risk. Taking a calculated risk, or even increasing a risk of a detrimental result, does not equate to making the detrimental result direct, natural, or probable. The only relevant direct, natural, or probable result of the Forest Service policies pleaded by the landowners was a heightened risk, not a wildfire that would spread to neighboring properties. The hole in the causal chain is the conversion of this risk into a wildfire by the hunter who started it.

The landowners argue that too much emphasis is placed on the ignition of the fire, and that the government is not required to light the match in order to effect a taking. Like the Moden plaintiffs, the landowners rely on the line of flood cases in which the government was found liable for a taking when water impounded for a dam flooded areas beyond the planned impoundment. In Cotton Land Co. v. United States, 75 F. Supp. 232 (Ct. Cl. 1948), a poorly constructed dam caused sediment to deposit in the riverbed upstream of the dam. Over time, the sediment raised the level of the river bottom until the waters crested the banks, flooding the plaintiff's land. The court found a taking even though the injury occurred years after the act of constructing the dam, because the flooding was the "natural consequence[] of the collision of sediment-bearing flowing water with still water, and the progress upstream, of the deposit begun by that collision." Id. at 233. The court further noted that had the engineers studied the question in advance, they would have predicted the flood with specificity. Id. at 233-34. In Avery v. United States, 330 F.2d 640 (Ct. Cl. 1964), the court further explained that the permanent flooding of the landowners' property in Cotton Land was "originally set in motion by the erection of the dam," id. at 645, and that the flood was the "actual and

natural consequence of the Government's act" because it was the natural progression of a chain of events occurring in a natural order without an intervening activity to break the chain of causation.  Id.

The landowners argue that the Forest Service policies are analogous to building a dam.  Dams disrupt the natural flow of water for the public good in the same way that fire suppression disrupts the natural consumption of fuel for the public good.  Like the Cedar Fire, the flooding in Cotton Land did not occur immediately after governmental action; the flooding resulted from "a succession of events . . . initiated" by the erection of the dam, including the filling of the riverbed with sediment which raised the level of the water and eventually overtopped the riverbanks flooding the private property.  75 F. Supp. at 233.

The key difference between the flood cases and the instant controversy is that the policy of suppressing fires did not set the Cedar Fire in motion as the dams did the floods.  Cf. Avery, 330 F.2d at 645.  As the court in Cotton Land noted, further study would have predicted the flood, when it would occur, and where it would occur.  75 F. Supp. at 234.  Here, as the landowners implied in their pleadings, for an injury resulting from the policy of suppressing fires in the CNF to occur, something had to ignite the fire. While the landowners pleaded that the government took the risk of a hunter or other recreational user starting a fire in the forest with its policy of welcoming such users, an actual ignition, not a risk, is what set the wildfire in the CNF.  The hunter setting the fire was an intervening cause which broke any perceived chain of causation between the Forest Service's policies and the Cedar Fire.

This is not to say that the government may escape liability per se by finding an incidental intervening or contributing cause between their authorized action and the alleged injury. Wherever there is an authorized action, the causation prong is satisfied for any injury which is the direct, natural, and probable result of that action. For instance, had the government action been to accumulate fuel loads in the CNF, even without knowledge that such fuel loads would become a large conflagration upon any ignition, then any ignition, even one negligently started by unauthorized human hands, would be adequate for that government act to satisfy the causation prong. This is because an ignition is the direct, natural and probable result of the government intentionally allowing fuel loads to accumulate in a fire zone, and a conflagration is the direct, natural, and probable result of this ignition in a forest with high fuel loads. However here, there is no authorized act of allowing the growth of fuel loads, and there are no direct, natural, and probable paths between the actual authorized acts of suppressing fires and the Cedar Fire conflagration. Only by an intervening cause was the authorized action converted into a damaging event. The landowners would be correct that the government did not need to light the match to be liable, but to be a taking, it must have at least authorized supplying the fuel.

As a result, the question may not be whether the Forest Service's polices, a lost hunter, or even a bolt of lightning caused the Cedar Fire. Ignition sources are ubiquitous in the CNF, but the landowners must allege in their complaint that the fire that destroyed their property was the direct, natural, and probable result of the forest management policies. They have not. The sequence of events in Cotton Land operated like a Rube Goldberg machine, with a concrete beginning (the dam), an

ending (the flood), and in the middle, a series of steps each inevitably following from the one before it. Here, there is no concrete beginning, but merely a long sequence of decisions, some risk-increasing but others risk-decreasing, spread out over decades. No individual decision can be a beginning because each risk-decreasing action in the Forest Service's policies is an intervening act breaking whatever causal chain would lead from an accused risk-increasing action to the conflagration which destroyed the landowners' property. Therefore, we cannot infer from the complaint the steps between fuel load accumulation and the damage to the landowners' property with the specificity required by Cotton Land. Instead, the landowners attempt to rely on the insufficient general allegation that the risk of damage arose from the buildup of flammable vegetation.

The landowners also respond that where the injury is foreseeable, there can be no intervening cause. See Moden, 404 F.3d at 1343-34 (reviewing the rejection of the "remoteness of cause" defense in Cotton Land, 75 F. Supp. 232). They argue that the government actually foresaw the destruction of property by fire escaping the CNF. However, they misunderstand the precedent. Avery clarified that we look to the law of torts when handling a remote cause, and when no intervening cause breaks the chain of causation, we have found a taking. 330 F.2d at 644-45. "[I]n other words, injury may not be foreseeable if an intervening cause breaks the chain of causation." Moden, 404 F.3d at 1344. This does not mean that the reverse is true, that an injury foreseeable necessarily is without a break in the chain of causation. Foreseeability and causation are separate elements that must both be shown (when intent is not alleged). See Moden, 404 F.3d at 1343 ("In addition to causation, an inverse condemnation plaintiff

must prove that the government should have predicted or foreseen the resulting injury." (emphasis added)). For an injury to be a compensable taking, the court must determine that no break in the chain of causation existed between the suspected government authorized action and the injury. The landowners have identified the fire suppression and recreational use policies as the government authorized actions which caused the destruction of their property. However, even if the destruction of the property was foreseeable, as we must accept at the pleading stage, the hunter lighting the signal fire was a clear intervening cause that broke the chain of causation between the authorized act and the injury.

The landowners also fail to satisfy the appropriation prong of Ridge Line. "Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners' right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." Ridge Line, 346 F.3d at 1356. The landowners have not pleaded and we cannot discern any reason to conclude that the invasion has appropriated any benefit to the government.

The landowners pleaded that the government was acting in the public interest when it performed under its fire suppression and recreational use policies. They said that the Forest Service continued its land management policies, including its public access practices, in furtherance of the public's interest: the preservation of timber, watersheds and wildlife, and public use and enjoyment. They argue that they should not be required to shoulder the loss for the public. However, these public interests are not benefits resulting from the invasion that destroyed the properties. To the contrary,

the wildfire that destroyed the properties also destroyed the public interests the policies sought to protect.

This is in contrast to the flood cases. For instance, in Ridge Line, when the landowners' property was inundated, even though sporadically, the government was found to have acquired a flowage easement from the runoff created by its alteration of the area's storm drainage. 346 F.3d at 1352. Here, the government has acquired no easement of any sort, or any other property through the fire.

The landowners also argue that they meet the second prong because their real and personal property was destroyed. They argue that one can plausibly infer from this allegation that because the fire destroyed the infrastructure, their right to enjoy their property has been preempted for an extended period of time because they cannot rebuild upon, or in some cases even access their land, five years after the fire. But we cannot plausibly infer that the fire, which was the invasion and is now extinguished, still prevents the rebuilding of infrastructure that would allow the landowners to reoccupy their property.

To meet this preemption formulation of the appropriation prong, the complaint must allege that "the government's interference with any property rights of [the landowners] was substantial and frequent enough to rise to the level of a taking." Ridge Line, 346 F.3d at 1357. That language developed from the long history of the Supreme Court's flooding cases. A flood that invades land permanently may give rise to a takings claim. United States v. Lynah, 188 U.S. 445, 470 (1903) ("It is clear from these authorities that where the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value

there is a taking within the scope of the 5th Amendment."). Similarly, a flood gives rise to a taking where it creates a "permanent liability" because of "intermittent but inevitably recurring overflow." United States v. Cress, 243 U.S. 316, 328 (1914) ("There is no difference of kind, but only of degree, between a permanent condition of continual overflow by backwater and a permanent liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other."). But floods that visit once and then recede do not give rise to takings claims. Sanguinetti v. United States, 264 U.S. 146, 150 (1924) (holding that "the injury was in its nature indirect and consequential, for which no implied obligation on the part of the Government can arise" where flooding is neither permanent, nor is intermittent but inevitably recurring); see also Bartz v. United States, 633 F.2d 571, 577 (Ct. Cl. 1980) (listing cases where plaintiffs could not recover because "they failed to prove the element of inevitably recurring floods"). The former two types of floods appropriate the landowner's property; the latter injures but does not appropriate it.

The landowners contend that the taking is permanent, arguing that "[f]ire, however, is not like one or two floodings that recede and then allow for a repossession of the land." But many a city has rebuilt after a devastating fire, so we cannot infer from the complaint that the fire prevented the rebuilding of infrastructure that would allow the landowners to reoccupy their property. Furthermore, floods and fires can both substantially injure real and personal property with merely one invasion. In the flooding cases, appropriation means that the water stays on the property indefinitely, or predictably returns—a permanent invasion. Here, the fire has come and gone, and there is no allegation that the injuries prevent future use of the land, or that the fire will

intermittently but inevitably recur. To satisfy the appropriation requirement, the preemption must be sufficiently permanent that it can be said that the government has exercised dominion over the property.

## CONCLUSION

Accordingly, the judgment of the United States Court of Federal Claims is affirmed.

## AFFIRMED