# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Parwan Group Company ) ASBCA No. 60657
)
Under Contract No. SP0600-13-D-9504 )

APPEARANCES FOR THE APPELLANT: Eric S. Montalvo, Esq.
Lauren R. Brier, Esq.
  The Federal Practice Group Worldwide
  Service
  Washington, DC

APPEARANCES FOR THE GOVERNMENT: Daniel K. Poling, Esq.
  DLA Chief Trial Attorney
Matthew Vasquez, Esq.
  Trial Attorney
  DLA Energy
  Fort Belvoir, VA

## OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS ON THE GOVERNMENT'S MOTION FOR PARTIAL DISMISSAL FOR LACK OF JURISDICTION AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Appellant Parwan Group Company (Parwan) appeals from a contracting officer's final decision denying its claim for unanticipated security costs arising out of a fuel delivery contract in Afghanistan. The Defense Logistics Agency-Energy (DLA) moves for partial dismissal for lack of jurisdiction, alleging that portions of Parwan's complaint raise claims that were not presented to the contracting officer for final decision prior to the filing of Parwan's appeal. DLA also moves to dismiss the entire appeal for failure to state a claim upon which relief can be granted. Parwan opposes the motion.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

On 23 April 2012, DLA issued Solicitation No. SP0600-12-R-0208 (solicitation) seeking proposals for the transportation of government-owned fuel products in Afghanistan (R4, tab 1 at 47).[1] Amendment No. 0005 to the solicitation

---

[1] Citations to the Rule 4 file are to the consecutively-numbered pages unless otherwise indicated.

contained answers to questions from offerors about a number of issues, including three related to convoy security (R4, tab 2 at 93-94).[2] In response to those security questions, DLA informed offerors that "vendors considering the use of armed private security will not be considered for award" (*id.* at 94). Offerors were also informed that there would be "no US Government provided escorts" for the contractor-provided services (*id.*).

Parwan interpreted those responses to mean that the use of security for any particular convoy would be left to the contractor's discretion, and that "if [the contractor] did not provide security [it] bore the risk of non-performance for each unsuccessful shipment" (compl. ¶ 8). Accordingly, when Parwan submitted its proposal on 27 June 2012, it did not include costs for convoy security (*id.* ¶¶ 8, 58).

On 28 November 2012, DLA awarded Contract No. SP0600-13-D-9504 (contract) to Parwan (R4, tab 6 at 1). This fixed-price commercial item contract consisted of a two-year base period from the date of award through 31 December 2014, and a one-year option period from 1 January 2015 through 31 December 2015, for a total estimated contract value of $12,902,090 (R4, tab 6 at 126-27; gov't mot. at 1-2). The contract included Federal Acquisition Regulation (FAR) clause 52.243-1, CHANGES–FIXED-PRICE (AUG 1987), ALTERNATE IV (APR 1984), which states in relevant part:

> (a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:
>
> (1) Specifications.
> (2) Work or services.
> (3) Place of origin.
> (4) Place of delivery.
> (5) Tonnage to be shipped.
> (6) Amount of Government-furnished property.
>
> (b) If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract

---

[2] When receiving a motion to dismiss for lack of jurisdiction, the facts supporting jurisdiction are subject to fact-finding based on the Board's review of the records. *See, e.g., CCIE & Co.,* ASBCA Nos. 58355, 59008, 14-1 BCA ¶ 35,700 at 174,816.

price, the delivery schedule, or both, and shall modify the contract.

(R4, tab 6 at 143)

The contract also included two clauses relevant to Parwan's performance under this contract – clause 952.225-0004, COMPLIANCE WITH LAWS AND REGULATIONS (DEC 2011); and clause 252.225-7995, CONTRACTOR PERSONNEL PERFORMING IN THE UNITED STATES CENTRAL COMMAND AREA OF RESPONSIBILITY (DEVIATION 2011-O0004) (APR 2011) (R4, tab 6 at 133, 147). These clauses imposed upon Parwan two key obligations. First, under both clauses, Parwan was required to comply with all host nation laws (*id.*). Second, under clause 252.225-7995(c), "[u]nless specified elsewhere in the contract, the Contractor is responsible for all logistical and security support required for contractor personnel engaged in this contract" (*id.* at 147).

The contract's performance work statement (PWS) reiterated Parwan's obligation to comply with host nation laws, stating that Parwan must "remain in full compliance with all laws, decrees, labor standards, and regulations of the Afghanistan Government" (R4, tab 1 at 47). The PWS also stated that the U.S. Government "will not provide security escort for trucks transporting fuel product in Afghanistan" (*id.* at 48).

In February 2013, after Parwan began making deliveries, the Afghan government issued a decree stating that all convoys delivering fuel for the U.S. Government using "southern routes" would henceforth be required to use security escorts (R4, tab 29 at 492, 586). The decree further stated that private companies were no longer authorized to provide security escorts, and that Parwan would be required to use the security services of the Afghan Public Protection Force (APPF), a state-owned enterprise of the Afghan Ministry of the Interior (*id.*).

By email dated 7 March 2013, Parwan informed DLA that the new requirement to use security escorts had caused security costs for all companies transporting fuel for the U.S. Government to "skyrocket," and that for Parwan in particular, the increased costs had become "almost prohibitive" (app. supp. R4, tab 38 at 4). By email dated 8 March 2013, DLA advised Parwan that it was working "to find a payment solution" (*id.* at 3).

On 24-25 April 2013, representatives from DLA and Parwan met to discuss the increased security costs and the possibility of Parwan filing a request for equitable adjustment (REA). Pursuant to that meeting, DLA instructed Parwan to submit an REA "for the change to the method of shipping and the attendant increase in costs incurred by Parwan." (Compl. ¶¶ 15-16) By email dated 26 May 2013, Parwan notified DLA that it was experiencing delays in delivery that it attributed to the

3

security escorts (app. supp. R4, tab 39). The parties thereafter exchanged additional emails discussing the delays, with DLA twice requesting information from Parwan concerning its "issues" with APPF (R4, tabs 10-11; app. supp. R4, tabs 40-43). By email dated 17 June 2013, DLA also requested that Parwan advise it of what actions could be taken by DLA to "alleviate the delays in delivery" (app. supp. R4, tab 42). It is unclear whether Parwan ever responded to this request.

By email dated 11 July 2013, DLA requested additional information regarding Parwan's working relationship with APPF, including "systemic problems" regarding scheduling and cancellations. Parwan responded that same date, stating with respect to the systemic problems that "[w]e do not really get told why a convoy is cancelled, usually the reason given is security, we do know at times that they do not always have the assets available." (App. supp. R4, tab 46 at 53, 55)

In July 2013, Parwan submitted two REAs to the contracting officer, neither of which are at issue in this appeal. In an email dated 3 September 2013, Parwan submitted a third REA (REA 3) seeking reimbursement for increased costs associated with the security escorts, which it described as "excessive" (R4, tab 15 at 243). By email dated 20 September 2013, Parwan amended REA 3 to include additional costs (R4, tab 16). In October, November and December 2013, Parwan emailed the contracting officer requesting an update on the status of its REAs, including REA 3 (R4, tabs 17-18, 20). In those emails, Parwan mentioned that it was experiencing financial difficulties while the REAs were pending, noting that Parwan "could be upside-down financially on this contract," that if the REAs were not approved it would be "running at an extensive loss" and it did not "know our current financial position as we have so many items pending" (R4, tab 17 at 276-77, tab 20 at 340).

By email dated 2 December 2013, DLA informed Parwan "[a]s a reminder" that APPF was the "only authorized armed security provider" under Afghan law, and "[i]f caught using unauthorized armed security you risk negative reports and/or losing your entire contract" (R4, tab 19). By letter dated 27 March 2014, DLA denied Parwan's requests for reimbursement, stating that the increased security costs were not reimbursable under the contract (R4, tab 24 at 456). By letter dated 22 April 2014, the contracting officer reiterated to Parwan that, "per the terms of the contract, DLA Energy does not reimburse or pay any security fees, including any fees from APPF security" (R4, tab 25 at 459).

By letter dated 31 May 2015, Parwan filed its certified claim seeking a contracting officer's final decision on several issues raised in its REAs (R4, tab 29).

4

With respect to the security costs, the claim sought $1,022,440,[3] and made the following points:

> a. At the time it submitted its bid proposal to DLA, Parwan was not obligated to use any armed security for its convoys, and therefore did not include any security costs in its bid proposal;
>
> b. In February 2013, the Afghan Ministry of the Interior informed Parwan that it would be required to begin using APPF security escorts at the end of that month;
>
> c. The terms of the contract required Parwan to comply with all U.S. and host nation laws; and
>
> d. Because Afghan law now required it to use APPF security escorts, an obligation "reinforced and reiterated" by DLA employees, Parwan was entitled to the increased costs of performance.

(*Id.* at 492-93)

Parwan's claim included invoices reflecting the increased security costs (R4, tab 29 at 595-617). Parwan also sought a contract modification to reflect the new security obligation, which it argued was a reasonable request because the additional expenditure "was not contemplated in the award costs, is required by Afghan law and indirectly by the contract, and may result in financial ruin for the company" (*id.* at 493). Specifically with respect to the increased security costs, Parwan's claim made no mention of the impact of delivery delays.[4]

By letter dated 14 April 2016, DLA issued the contracting officer's final decision, which denied the portion of Parwan's claim seeking reimbursement for the increased security costs (R4, tab 35). DLA denied changing the contract requirements, citing the contract provisions that required Parwan to comply with host nation law and that assigned responsibility for security to Parwan. DLA also pointed out that a fixed-price contract such as Parwan's places upon the contractor "maximum risk and full responsibility for all cost and resulting profit or loss" meaning that "the use of

---

[3] That amount has now increased to $1,044,660 to reflect invoices Parwan received from APPF after submission of its claim (compl. ¶¶ 32-33).

[4] Parwan's claim also sought recovery for costs associated with delays in downloading fuel; however, those costs are unrelated to the increased security costs and are not at issue in this appeal (R4, tab 29 at 493-95).

APPF and any costs incurred...are not reimbursable under this contract." (*Id.* at 707) Parwan filed its notice of appeal by letter dated 1 July 2016. The appeal challenges only that portion of DLA's decision relating to Parwan's increased security costs.

## DECISION

Parwan's complaint asserts four grounds for relief.[5] Counts I and II allege that DLA changed the contract requirements, with Count II specifically alleging that the new security escort requirement constituted a constructive change (compl. ¶¶ 34-54). In Count III, Parwan alleges that a 15% increase in its overhead costs and severe delivery delays rendered its contract with DLA commercially impracticable (*id.* ¶¶ 55-62). Count IV alleges that Parwan "detrimentally relied" upon DLA's repeated assurances that the increased costs "would be taken care of," and that based upon those assurances, Parwan continued performance with the understanding that it would be "made whole" through an equitable adjustment (*id.* ¶¶ 63-70).

DLA has moved to dismiss Counts III and IV of the complaint, arguing that the Board lacks jurisdiction to entertain these allegations because they were never presented to the contracting officer. DLA has alternatively moved to dismiss the entire appeal for failure to state a claim upon which relief can be granted. We address the jurisdictional argument first.

### The Board's Jurisdiction over Counts III and IV

Parwan bears the burden of proving the Board's jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exchange Service*, 846 F.2d 746, 748 (Fed. Cir. 1988); *United Healthcare Partners, Inc.*, ASBCA No. 58123, 13 BCA ¶ 35,277 at 173,156. Pursuant to the Contract Disputes Act (CDA), "[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision." 41 U.S.C. § 7103(a)(1). "The scope of [an] appeal is determined by the claim originally submitted to the contracting officer for a final decision." *MACH II*, ASBCA No. 56630, 10-1 BCA ¶ 34,357 at 169,673. Accordingly, we do not possess jurisdiction over new claims that were not previously presented to the contracting officer. *Id.*

To determine whether a claim is new we examine whether it derives from the same set of common or related operative facts as the claim presented to the contracting officer and seeks the same or similar relief. *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003); *The Public Warehousing Company*, ASBCA No. 56022,

---

[5] For purposes of this decision we will refer to those four grounds for relief as Counts I through IV.

11-2 BCA ¶ 34,788 at 171,227. If the operative facts in the pleadings are essentially the same as those presented in the claim, they are within the scope of the appeal. *MACH II*, 10-1 BCA ¶ 34,357 at 169,673. Allegations presenting a new legal theory of recovery, or the introduction of additional facts that do not alter the nature of the original claim, do not constitute a new claim if they are based upon the same operative facts included in the original claim. *Trepte Construction Co.*, ASBCA No. 38555, 90-1 BCA ¶ 22,595 at 113,385-86. Where proof of the new legal theory includes operative facts differing from those in the original claim, however, "the essential nature of the claim has been changed and we do not have jurisdiction over the new claim until it is presented to the contracting officer for decision." *Shams Engineering & Contracting Co. & Ramli Co.*, ASBCA Nos. 50618, 50619, 98-2 BCA ¶ 30,019 at 148,525. The claim must provide a "clear and unequivocal statement that gives the contracting officer adequate notice" of its claim. *K-Con Building Systems, Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015) (quoting *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987)).

Count III – Commercial Impracticability

Count III of Parwan's complaint asserts that the new security escort requirement rendered the contract commercially impracticable. To establish commercial impracticability, a contractor must show that "(1) a supervening event made performance impracticable; (2) the non-occurrence of the event was a basic assumption upon which the contract was based; (3) the occurrence of the event was not the contractor's fault; and (4) the contractor did not assume the risk of occurrence." *Spindler Construction Corp.*, ASBCA No. 55007, 06-2 BCA ¶ 33,376 at 165,462 (citing *Seaboard Lumber Company v. United States*, 308 F.3d 1283, 1294-95 (Fed. Cir. 2002)). The doctrine applies where "the costs of performance amount to commercial senselessness...[not] just because performance cannot be achieved most economically." *Safety Training Systems, Inc.*, ASBCA Nos. 57095, 57166, 14-1 BCA ¶ 35,509 at 174,051 (citing *Natus Corp. v. United States*, 371 F.2d 450, 457 (Ct. Cl. 1967)). Thus "[a] showing of simple economic hardship is not sufficient." *American Combustion, Inc.*, ASBCA No. 43712, 94-3 BCA ¶ 26,961 at 134,243 (citing *Jennie-O Foods, Inc. v. United States*, 580 F.2d 400, 410 (Ct. Cl. 1978)).

Count III specifically alleges that "[a]t the time of Contract formation, both parties assumed transportation security was neither needed nor required to ship products along certain routes in Afghanistan," and for this reason, the solicitation did not include a requirement "mandating the use of APPF escorts" (compl. ¶¶ 56-57). Count III further alleges that based upon this understanding, Parwan did not include security costs in its bid price (*id.* ¶ 58). Count III then asserts that the subsequent requirement to use security escorts rendered the contract commercially senseless, because Parwan incurred a 15% increase in overhead costs and experienced severe delivery delays due to difficulties in coordinating shipments (compl. ¶¶ 61-62).

7

DLA contends that Count III is based upon materially different facts than those alleged in Parwan's claim, which DLA notes did not mention commercial impracticability (gov't mot. at 7). Parwan disagrees, arguing that Count III merely presents a new legal theory rather than a new claim (app. opp'n at 25-27). Parwan describes the claim as having asserted that the new security requirement was "unexpected" and "unforeseen," but fails to identify any specific language in the claim that supports this assertion (*id.* at 26). Parwan also notes that the 15% increase in security costs can easily be calculated from the invoices attached to the claim (*id.*). With respect to the complaint's references to delivery delays, Parwan maintains that they "derive directly from the change in contract" addressed in its claim, but it, again, fails to identify any language in the claim that supports this assertion (*id.* at 27).

We agree with DLA. The operative facts of Parwan's claim are straightforward and simple: 1) Parwan did not include any costs for security escorts at the time it submitted its bid because the solicitation did not require it; 2) after performance began, Afghan law changed, requiring Parwan to use security escorts if it wished to operate in Afghanistan; 3) Parwan is contractually required to comply with host nation law; and 4) as a result, Parwan incurred additional costs exceeding the contract price (R4, tab 29 at 492-93). The claim does not address what the parties believed with respect to the need for security escorts, nor does it mention a reason the solicitation did not require security escorts (*id.*). Although Parwan submitted invoices for the security escort costs with its claim, the claim document itself only minimally addresses the impact of those costs, and it is silent with respect to the impact of delivery delays (*id.* at 492, 595-617).

While it is true that in determining the scope of the claim we may "examine the totality of the correspondence...[and] the continuing discussions, between the parties," *Public Warehousing*, 11-2 BCA ¶ 34,788 at 171,228, the record here does not support including commercial impracticability within the scope of Parwan's claim. With respect to the impact of the increased security costs, although there are other references to financial hardship contained in the record, they are vague and conclusory at best (R4, tabs 15-18, 20; app. supp. R4, tab 38). In addition, while the record indicates the parties discussed delivery delays on several occasions in 2013 prior to the filing of REA 3 (R4, tabs 10-11; app. supp. R4, tabs 29-43, 46), it contains no evidence Parwan ever communicated to DLA that it believed the impact of those delays was so severe that it rendered the contract commercially senseless.

Parwan's claim is in essence a question of contract interpretation, i.e., the impact of the change in Afghan law upon Parwan's contractual obligations. Count III goes far beyond that limited analysis, altering the claim's essential nature by requiring factual inquiry into whether DLA shared Parwan's assumption that security escorts would not be required, why security escorts were not required by the solicitation and whether the increased costs and the impact of delivery delays were so great that they rose to the

8

level of commercial impracticability. Because Parwan's claim did not provide a "clear and unequivocal statement that [gave] the contracting officer adequate notice" it was alleging commercial impracticability, we do not possess jurisdiction over Count III of Parwan's complaint. *K-Con Building Systems*, 778 F.3d at 1005.

### Count IV–Detrimental Reliance

Count IV of Parwan's complaint alleges that shortly after the Afghan government imposed the new security requirement, DLA provided assurances that a "payment solution" would be found (compl. ¶ 14). Count IV further alleges that Parwan, relying to its detriment upon those assurances, continued to perform and "absorb[ed] the additional costs with an understanding that [it] would be made whole through an equitable adjustment" (compl. ¶¶ 65-69).

In its opposition brief, Parwan elaborates on Count IV and argues that based upon this detrimental reliance, DLA is estopped from denying liability for the security costs (app. opp'n at 27-28). Characterizing Count IV as a new legal theory rather than a new claim, Parwan avers that it "emerges directly" from two facts referenced in the claim–1) that in February 2013 Parwan was required to use security escorts in order to fulfill its contractual obligations; and 2) that this "change to its contract requirements was 'reinforced and reiterated by DLA employees'" (*id.* at 27).

We do not agree that the difference here is merely the legal theory in the claim. The two statements referenced by Parwan cannot be reasonably interpreted as informing DLA that Parwan was asserting an estoppel claim. Equitable estoppel requires: 1) some form of misleading conduct, which may consist of silence or inaction as well as affirmative action, leading another to reasonably infer that rights will not be asserted against it; 2) reliance upon the misleading conduct; and 3) material prejudice due to the reliance. *Mabus v. General Dynamics C4 Systems, Inc.*, 633 F.3d 1356, 1359 (Fed. Cir. 2011). There is nothing in Parwan's claim asserting that DLA assured Parwan it would be paid, either falsely or otherwise, or that Parwan was relying upon any such assurances in continuing to incur the additional costs. Count IV introduces a new set of facts that are wholly unrelated to the claim and that materially alter the claim's essential nature. We therefore find that Count IV is also a new claim over which we do not possess jurisdiction.

### Breach of Implied Duty to Cooperate

In its opposition brief, Parwan for the first time alleges that DLA breached its implied duty to cooperate, and that this breach constituted a constructive change to the contract (app. opp'n at 15) (citing *R.W. Jones Construction, Inc.*, IBCA No. 3656-96, 99-1 BCA ¶ 30,268 at 149,681). DLA characterizes this allegation as an implicit request by Parwan to amend its complaint, which it argues should be denied because it

9

represents a new claim not previously presented to the contracting officer (gov't reply at 15). Although the Board may permit a party to amend its pleadings upon conditions fair to both parties, *see* Board Rule 6(d), the Board will deny a request to amend a complaint if the amendment is essentially a new claim based upon operative facts not already presented to the contracting officer. *GSC Construction, Inc.*, ASBCA No. 59046, 15-1 BCA ¶ 35,882 at 175,429.

The implied duty to cooperate arises out of the implied duty of good faith and fair dealing that every contract contains. *Metcalf Construction Company v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014). The duty requires the government to do "what is reasonably necessary to enable the contractor to perform." *SEB Engineering, Inc.*, ASBCA No. 39728, 94-2 BCA ¶ 26,810 at 133,352. Parwan's opposition brief alleges that DLA breached this duty when it took over a year to deny Parwan's requests that it be reimbursed for the increased security costs (app. opp'n at 15-17).

Parwan identifies no provision in the claim itself supporting its contention that DLA breached this duty. Instead, Parwan points to the allegations in the complaint that even though it began requesting reimbursement for the security costs as early as March 2013, DLA did not deny that request until 27 March 2014 (app. opp'n at 16-17 (citing compl. ¶¶ 12-24, 65-68)).

It is not the complaint, however, but the claim that forms the basis for our jurisdiction. *Madison Lawrence, Inc.*, ASBCA No. 56551, 09-2 BCA ¶ 34,235 at 169,207; *MACH II*, 10-1 BCA ¶ 34,357 at 169,673. As DLA notes, Parwan's claim makes no reference to its earlier requests for reimbursement or any unreasonableness on DLA's part in resolving those requests (gov't reply at 15; R4, tab 29 at 492-93). We therefore hold that Parwan's contention that the government breached its duty to cooperate represents a new claim not previously presented to the contracting officer over which we do not possess jurisdiction.[6]

Failure to State a Claim upon which Relief can be Granted

We next turn to DLA's contention that Parwan's complaint fails to state a claim upon which relief can be granted (gov't mot. at 9-19). The Board will grant a motion to dismiss for failure to state a claim when the complaint fails to allege facts "'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *American General Trading & Contracting, WLL*, ASBCA No. 56758, 12-1 BCA ¶ 34,905 at 171,640. The

---

[6] DLA also urges the Board to reject Parwan's breach allegation because it would be futile on the merits (gov't reply at 14). Based upon our holding here, we need not consider that argument.

allegation "must be enough to raise a right to relief above the speculative level." *Cary,* 552 F.3d at 1376. In addition, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). We "must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant." *Kellogg Brown & Root Services, Inc. v. United States,* 728 F.3d 1348, 1365 (Fed. Cir. 2013). We are not required, however, to accept as true legal conclusions inaccurately portrayed as factual allegations. *Exelis, Inc.,* ASBCA No. 60131, 17-1 BCA ¶ 36,679 at 178,606 (citing *Acceptance Ins. Companies, Inc. v. United States,* 583 F.3d 849, 853 (Fed. Cir. 2009)).

In addition to reviewing the allegations contained in the complaint, the Board may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *A&D Auto Sales, Inc. v. United States,* 748 F.3d 1142, 1147 (Fed. Cir. 2014) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)). Here, the focus of the complaint is the purported change in the contract's performance requirements from what was originally contemplated by the parties. Thus we may properly consider the contract's terms in determining whether Parwan's complaint states a claim upon which relief can be granted. *See CCIE & Co.,* 14-1 BCA ¶ 35,700 at 174,816.

Counts III and IV having already been dismissed for lack of jurisdiction, we are left only to evaluate the sufficiency of Counts I and II. Although far from a model of clarity, Count I appears to assert entitlement under the Changes clause itself (compl. ¶¶ 34-48).[7] However, nowhere in the complaint does Parwan allege the existence of a written change order, which the Changes clause requires. *See* FAR 52.243-1(a). Thus, to the extent that Count I seeks recovery strictly under the Changes clause, it fails to allege facts showing Parwan is entitled to relief.

In Count II, Parwan seeks relief under a theory of constructive change. "A constructive change occurs when a contractor performs work beyond the contract requirements, without a formal order under the Changes clause, due either to an express or implied informal order from an authorized government official or to government fault." *Circle, LLC,* ASBCA No. 58575, 15-1 BCA ¶ 36,025 at 175,974 (citing *Bell/Heery v. United States,* 739 F.3d 1324, 1335 (Fed. Cir. 2014)). Thus in the absence of government action or fault, the constructive change doctrine cannot form

---

[7] Parwan's opposition brief further confuses the issue by recharacterizing Count I as a constructive change claim and Count II as a claim for breach of the implied duty to cooperate (app. opp'n at 8, 10-18). Notwithstanding the confusion, we will proceed by examining the counts as they appear in the complaint.

11

the basis for recovery. *Int'l Data Prods. Corp. v. United States,* 492 F.3d 1317, 1325 (Fed. Cir. 2007).

Count II incorporates and expands upon an allegation appearing in Count I that in late February 2013, DLA began "ordering" Parwan to use security escorts (compl. ¶ 40), alleging that that this "demand" constituted a constructive change to the contract (compl. ¶¶ 49, 51, 54). We are not required, however, to give deference to Parwan's legal conclusion regarding the effect of DLA's "demand." *Exelis,* 17-1 BCA ¶ 36,679 at 178,606. The terms of the parties' contract explicitly allocated to Parwan responsibility for all security support required for contractor personnel, and further required Parwan to comply with all host nation laws (R4, tab 1 at 47-48, tab 6 at 123, 147). Moreover, as the complaint itself concedes, it was the Afghan government, not DLA, that mandated the use of security escorts (compl. ¶ 12).[8] We therefore find that DLA's "orders" were not intended to effect a change to the contract but rather to enforce the contract's terms. Thus a critical element of the constructive change doctrine–that the purported change was ordered by the government–is missing from Count II.

Additionally, in the alternative, we hold that Counts III and IV also fail to state a claim for relief. With respect to Count III, we note that commercial impracticability only applies where the contractor did not assume the risk that the supervening event might occur. *Spindler Construction,* 06-2 BCA ¶ 33,376 at 165,462. In the case of a fixed-price contract, however, that element cannot be established because it is the contractor, not the government, who bears the risk of unexpected costs. *Safety Training Systems,* 14-1 BCA ¶ 35,509 at 174,052. Parwan's complaint alleges no fact that would entitle it to shift that risk back to DLA.

With respect to Count IV, we note that while equitable estoppel "may be raised either as an affirmative defense or as grounds to prevent the defendant from raising a particular defense," it is not an independent cause of action that Parwan can assert. *Carlson v. Arnot-Ogden Memorial Hospital,* 918 F.2d 411, 416 (3d Cir. 1990); RGW *Communications Inc. d/b/a Watson Cable Co.,* ASBCA Nos. 54495, 54557, 05-2 BCA ¶ 32,972 (Board is without jurisdiction to entertain contracts implicit in law).[9]

---

[8] Paragraph 12 of the complaint is ambiguous as to whether it alleges that the requirement to use APPF security was imposed by the Afghan Ministry of interior or the U.S. Government. Parwan's brief makes clear that it is alleging that the Afghan Ministry imposes the requirement (app. opp'n at 5).

[9] DLA argues that the same would be true with respect to promissory estoppel (gov't reply at 13-14). While we do not believe that Parwan was asserting a claim based upon promissory estoppel, even if it were, Count IV would still fail. Although promissory estoppel can be used to create an affirmative cause of action, against parties other than the government, *Jablon v. United States,* 657

12

Accordingly, even if we found that Parwan had met the CDA's jurisdiction requirements for Counts III and IV, we would nevertheless dismiss them for failure to state a claim upon which relief can be granted.

## CONCLUSION

The government's motion is granted. Counts III and IV of the complaint are dismissed for lack of jurisdiction. The remaining counts at issue in this appeal, Counts I and II, are dismissed for failure to state a claim upon which relief can be granted.

Dated: June 25, 2018

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

---

F.2d 1064, 1068 (9th Cir. 1981), "[a]n obligation based upon promissory estoppel is a type of contract implied-in-law...and cannot be asserted against the government." *RGW Communications*, 05-2 BCA ¶ 32,972 at 163,338 n.13 (citations omitted).

13

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60657, Appeal of Parwan Group Company, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals