ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- | ) |
| | ) |
| Kamaludin Slyman CSC | ) ASBCA Nos. 62006, 62007, 62008 |
| | ) |
| Under Contract Nos. H92237-12-C-0089 | ) |
| H92237-12-C-0131 | ) |
| H92237-12-C-0322 | ) |

APPEARANCES FOR THE APPELLANT: Bryant S. Banes, Esq.
                                           Sean D. Forbes, Esq.
                                            Neel, Hooper & Banes, P.C.
                                            Houston, TX

APPEARANCES FOR THE GOVERNMENT: Jeffrey P. Hildebrant, Esq.
                                            Air Force Deputy Chief Trial Attorney
                                            Christopher M. Judge-Hilborn, Esq.
                                            Kyle E. Gilbertson, Esq.
                                            Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE PROUTY

These three consolidated appeals center upon appellant Kamaludin Slyman CSC (Kamaludin)'s leasing heavy construction equipment to the United States Army (Army) for use in Afghanistan via three separate contracts. It turned out that the Army needed to use the equipment at different locations than first anticipated, and for longer periods of time than the contracts permitted. The parties made some efforts to secure compensation to Kamaludin for the change in contract terms, but this never happened. In any event, about four or five months after this extended performance was completed, Kamaludin submitted three "letters of claim" to the Army seeking payment as a consequence. The amounts sought were $155,500; $55,000 and $18,183. The letters were not "certified" as that term is used in the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, and a later effort (almost six years after the original letters) was made by Kamaludin to retroactively certify them via email.[1] Shortly thereafter, Kamaludin submitted appeals to the Board of the deemed denials of its claim letters.

The government responded to the appeals by filing a motion to dismiss Appeal No. 62006 for lack of signature on its certification and to dismiss Appeal No. 62007 for

---

[1] Only the $155,500 claim required certification, since the threshold for certification under the CDA is claims exceeding $100,000. 41 U.S.C. § 7103(b).

1

failure to state a claim.[2] Since the signature issue required consideration by the Board's Senior Deciding Group, we considered it apart from the failure to state a claim contention and issued a decision revisiting our view of what constituted a "signature" for purposes of claims certification and holding that Kamaludin had submitted a properly certified claim in Appeal No. 62006. *See Kamaludin Slyman CSC*, ASBCA Nos. 62006 *et al.*, 20-1 BCA ¶ 37,694.

After the Senior Deciding Group issued its decision, and before we decided the motion to dismiss for Appeal No. 62007, the Army filed a motion for summary judgment in Appeal No. 62006, arguing that, even if the claim were properly certified, it was brought outside of the CDA's six-year statute of limitations. *See* gov't MSJ. In addition to responding directly to the Army's motion, Kamaludin argues that it should be permitted discovery before our deciding it. *See* app. MSJ opp.

Here, we decide both the Army's motion to dismiss and its motion for summary judgment.

## STATEMENT OF UNDISPUTED FACTS[3]

### I. The Contracts

The Army awarded three contracts to Kamaludin, a small Afghan company, in late 2011/early 2012. The first contract, Contract No. H92237-11-C-0322 (the Deh Bouchey contract), was executed by the parties on September 10, 2011 (R4, tab 2 at 1). It was for the provision of specified heavy construction equipment to a location in Afghanistan, Village Support Platform (VSP) Deh Bouchey, where it would be used for a three-month period, ending on December 14, 2011 (R4, tab 2 at 5).

Contract No. H92237-12-C-0089 was executed on December 25, 2011, and was for the provision of numerous pieces of heavy construction equipment at VSP LAM in

---

[2] We refer to the government's submissions with respect to the motion to dismiss as "gov't MTD" and "gov't MTD reply." Kamaludin's opposition to the motion to dismiss is "app. MTD opp." The government's motion for summary judgment will be referred to as "gov't MSJ" along with "gov't MSJ reply" for its reply brief. Kamaludin's opposition and sur-reply will be "app. MSJ opp." and "app. MSJ sur-reply," respectively.

[3] As will be discussed in more detail below, a motion to dismiss for failure to state a claim is decided based upon the terms of the complaint and documents incorporated into it without resort to an outside record, while a motion for summary judgment is based upon undisputed material facts and often rests upon evidence beyond the complaint and associated documents. For our purposes today, however, we may address the two together.

2

Afghanistan through June 30, 2012 (R4, tab 14 at 1, 4-5). By bilateral change order, executed by the parties on January 16, 2012, the location of the equipment was changed from VSP LAM to Fire Base (FB) Maholic (R4, tab 15), thus, we will refer to it as "the Maholic Contract."

Contract No. H92237-12-C-0131 (the Chenar contract) was executed on March 17, 2012, and was for the provision of a water truck and a dump truck for three months (ending June 15, 2012) at VSP Chenar (R4, tab 10 at 1, 3). What is not clear on the face of the VSP Chenar contract is that it actually was an extension, of sorts, of the Deh Bouchey contract: the water truck and dump truck in the Chenar contract had been originally provided by Kamaludin under the Deh Bouchey contract, but the government moved them to VSP Chenar without Kamaludin's permission and kept them there longer than the terms of the Deh Bouchey contract. The Chenar contract was essentially a back-dated way for the parties to remedy this out-of-scope action in the earlier contract (R4, tab 19 at 2)[4].

The three contracts all envisioned the equipment being used at the place of performance and appear to have implied that the equipment would be retrieved by Kamaludin from the Army at the close of performance at the place of performance: the Deh Bouchey contract required the equipment to be delivered by Kamaludin to VSP Deh Bouchey and inspected there and that performance of the contract would be there (R4, tab 2 at 5). Also, the contract specified that personal property of Kamaludin's left at the contract site after completion of the contract would be sold or otherwise disposed of by the government in accordance with 10 U.S.C. § 2575 (R4, tab 2 at 30).

The Chenar contract contained similar language to the De Bouchey contract about delivery and inspection of the equipment at VSP Chenar along with language that VSP Chenar was the location of performance (R4, tab 10 at 3). The Chenar contract also included similar language regarding the disposal of personal property after contract completion being accomplished pursuant to 10 U.S.C. § 2575 (R4, tab 10 at 22).

The Maholic contract, as modified, contained similar provisions to the Deh Bouchey and Chenar contracts regarding delivery and inspection of the equipment (*see* R4 tab 15 at 3) and disposal of personal property after the conclusion of performance in accordance with 10 U.S.C. § 2575 (R4, tab 14 at 29).

All three contracts incorporated by reference the standard Disputes clause provided by Federal Acquisition Regulation (FAR) 52.233-1 (*see* R4, tab 2 at 8 (Deh Bouchey); tab 10 at 5 (which incorporates FAR 52.212-4 for the Chenar contract, which, in turn, incorporates the Disputes clause); tab 14 at 7-8 (Maholic)). *Inter alia*, this clause

---

[4] We are citing here Kamaludin's "letter of claim" on the Deh Bouchey contract. The government agrees that it is accurate in this respect (gov't MTD reply at 12).

3

provides that the contracting officer's (CO's) decisions upon claims are final unless the contractor appeals or brings a suit pursuant to the CDA.  FAR 52.233-1(f).

II. The Government Holds Over the Equipment and the Parties Attempt to Remedy the Situation

In addition to holding over equipment from the Deh Bouchey contract and moving it to VSP Chenar, the government also held over construction equipment at FB Maholic for about five months past the Maholic contract's period of performance.  As noted above, the period of performance for the Maholic contract concluded on June 30, 2012 (R4, tab 14 at 1, 4-5).  But the government kept the equipment until November 15 or November 30, 2012 according to the government's own admissions and Kamaludin's subsequent "letter of claim," respectively, which we will discuss shortly (R4, tab 19 at 4; app. MSJ opp., ex. 3 at 6).[5]

Kamaludin recognized this use of its equipment was beyond the terms of the contract and sought to remedy the situation even as the government was still using it.  On August 27, 2012, Kamaludin sent an email to the Army inquiring about getting paid for the equipment being held over at FB Maholic.  (App. MSJ opp., ex. 1 at 2-3)  Kamaludin sent follow-up emails on September 10 and November 25 of the same year (app. MSJ opp., ex. 1 at 2-3).  The November 25, 2012 email included invoices from Kamaludin for the held-over equipment (*id*. at 2).  The record before us does not include any immediate government response to the earlier emails, but, on November 25, 2012, Ms. Danielle Anderson responded to Kamaludin, expressing regret for the "issues" in the contract and asking that Kamaludin provide a "certification" letter or email about the invoices.  The certification was to be in accordance with FAR 33.207(c) (app. MSJ opp., ex. 1 at 1), which is the FAR provision dealing with certifications to accompany claims made pursuant to the CDA.

In a separate correspondence on November 16, 2012, a "Major V," who we surmise to be the Major Vuong referenced in later correspondence, sent Kamaludin an email stating his understanding that the Army still held some of Kamaludin's equipment and that there were unpaid invoices.  Major Vuong promised to take action to return Kamaludin's equipment.  Major Vuong also explained that the equipment hold-over had been an unauthorized action that would need to be ratified so that the invoices could be paid.  (App. MSJ opp., ex. 1 at 1).  Indeed, the record includes an email, dated December 1, 2012, from Major Vuong to Sergeant First Class (SFC) Yarborough seeking his

---

[5] For our purposes, we need not determine which is correct and will use the November 30, 2012 date since other government correspondence from Major Vuong, discussed below, appears to support a finding of a date after November 15 and it is to the advantage of Kamaludin, whom we rule against, to use the later date.

4

completion of paperwork related to the "unauthorized commitment" (app. MSJ opp., ex. 4 at 2).

Apparently in response to this December 1, 2012 email, SFC Castillo, identified as the contracting officer's representative (COR), and a local commander executed a memorandum for record dated December 9, 2012, which recommend approval of a payment to Kamaludin in the amount of $154,900 in compensation for the unauthorized use of its equipment at FB Maholic (app. MSJ opp., ex. 3 at 5-6). The December 9, 2012 memorandum was shared with Kamaludin as a "cc" to an email (*id*. at 1).[6] The memorandum referred to Kamaludin's inability to recover the equipment "[d]ue to the vigorous terrain and high threat level in the area" (*id*. at 6), which, it will be seen, is language identical to that found in Kamaludin's March 16, 2013 letter of claim (*compare* app. MSJ opp., ex. 3 at 6 *with* R4, tab 19 at 4) and, for unknown reasons, included certification language from FAR 33.207. This memorandum, to be clear, was signed by government employees, not Kamaludin and, being on government letterhead, was drafted by the government as well (*id*. at 6-7).

### III. Kamaludin Submits "Letters of Claim" Alleging That the Army Held its Equipment Beyond the Terms of the Contracts

On March 16, 2013, Kamaludin submitted to the Army a self-styled "letter of claim" for each of its three contracts (*see* R4, tab 19). Since the Deh Bouchey claim is not subject to the government's motions, we may summarize it by stating that it alleged that the government extended the period of performance with only partial compensation for four of the pieces of heavy equipment that Kamludin ultimately retrieved in January 2012, while Kamaludin again only received partial compensation for the Army's use of the water truck and dump truck it moved to VSP Chenar up until the execution of the Chenar contract in March 2012. (R4, tab 19 at 2)

Turning to the Chenar claim, unfortunately for the reader, we need to reproduce the entirety of the letter of claim, for reasons to be described in the "Decision" portion of this opinion. It follows below:

---

[6] Kamaludin's complaint states that on December 9, 2012, the COR forwarded "claims" on behalf of Kamaludin to the CO seeking payment in the same amounts that Kamaludin requested in its March 2013 "letters of claim" for the "unauthorized commitments" that led to the equipment hold-overs. Compl. ¶ 5. We presume this is a reference to the government memorandum for record since Kamaludin points to no other document with that date. This document does not purport to be a forwarding of a claim, though it does include as attachments Kamaludin's invoices for the held-over equipment.

I am submitting a letter of claim for Heavy Equipment Contract H92237-12-C-0131 at VSP Chenar, Khakrez district, Kandahar, Afghanistan.

a. VSP Chenar is located approximately 75 km north of Kandahar City. The contract stated above was awarded for VSP Chenar as a three month contract with the Period of Performance (PoP) of 16 March 2012 to 15 June 2012. Renewal for this contract and a Mission Essential Letter (MEL) to bridge the expired contract were not submitted by the previous unit in a timely manner, resulting in an unauthorized commitment. Due to the vigorous terrain and high threat level in the area I was unable to recover the equipment under contract. Additionally, the previous unit breached the original contract by relocating the equipment from VSP DE Bouchey to VSP Chenar without my permission; Contract Number H92237-11-C-0322.

b. The contracted equipment has been subjected to an unauthorized commitment for a period of five months and 15 days; 16 June 2012 to 30 November 2012. I was told by the previous unit that no equipment could be moved to Chenar because of security and that they could not bridge the contract because they had breached it because they relocated the equipment without permission. I was told that they needed the equipment there and that I would receive proper compensation when all was said and done. The equipment has been returned to me but I have not been compensated which is why I am submitting this claim. Utilizing the same prices as agreed up during the initial contract, I provided invoices for the Unauthorized Commitment dates of 16 June 2012 to 30 November 2012.

The total amount of this UAC is ($55,000.00)
Very Respectfully,
[here, there is an ink signature, presumably of Mr. Kamaludin Slyman]
Kamaludin
President,
KSCC

(R4, tab 19 at 3) (syntax in original). In sum, this claim is for the holding over of the water truck and dump truck at VSP Chenar until November 30, 2012, past the June 15,

2012, end of the contract's performance period. In its complaint to the Board for this appeal, Kamaludin characterizes its claims for all three contracts as reflecting the government's holding the equipment past the lease periods and in some instances moving it to inaccessible locations. Compl. ¶ 3.

We reproduce the Maholic letter of claim in full as well:

> I am submitting a letter of claim for Heavy Equipment Contract H92237-12-C-0089 at Fire base Maholic, Kandahar, Afghanistan,
>
> a. Firebase Maholic is located approximately 5 km north west of Kandahar City. Contract H92237-12-C-0089 was originally awarded to VSP Lam, but an Amendment of Solicitation Modification of Contract was submitted and approved to change it to Firebase Maholic. The contract stated above was awarded to Firebase Maholic as a six month contract with the Period of performance (PoP) of 01 January 2012 to 30 June 2012. After the contract was awarded, the previous unit at Firebase Maholic relocated the contracted equipment, without modification to the standing contract, to two separate locations; VSSA Baghak and VSP Chenar. Renewal for this contract and a Mission Essential Letter (MEL) to bridge the expired contract were not submitted by the previous unit in a timely manner.
>
> b. The contracted equipment has been subjected to an unauthorized commitment for a period of five months; 01 July 2012 to 30 November 2012. I was told by the previous unit that no equipment could be moved to VSP Chenar and VSSA Baghak because of security and that they could not bridge the contract because they had breached it because they relocated the equipment without permission. I was told that they needed the equipment there and that I would receive proper compensation when all was said and done. The equipment has been returned to me but I have not been compensated which is why I am submitting this claim. Utilizing the same prices as agreed up during the initial contract, I provided invoices for the Unauthorized Commitment dates of 01 July 2012 to 30 November 2012.
>
> The total amount of this UAC is (155,500.00)

Very Respectfully,
[here, there is an ink signature, presumably of Mr. Kamaludin
Slyman]
Kamaludin
President,
KSCC

(R4, tab 19 at 4) (syntax in original). Again, in summary, this claim involves the holding over of equipment by the Army past the contractual period of performance up until November 30, 2012 with the cost, here, adding up to $155,500 (*id*.).[7]

The record includes an internal Army email dated March 25, 2013, from SFC Yarborough indicating that the letters of claim submitted by Kamaludin on March 16, 2013, were being treated as claims by Army contracting because of "fiscal year irregularities" (app. MSJ opp., ex. 4 at 1-2). The COR from FB Maholic forwarded this correspondence to Kamaludin on March 25, 2013, informing it that the requests for payment were being processed but that he did not know how long it would take and that Kamaludin should be "patient" (app. MSJ opp., ex. 4 at 1).

Kamaludin was, indeed, patient, but did not forget about its requests for money. The record includes emails from Kamaludin to the Army dated June 18, 2014; July 8, 2014; November 14, 2014; December 3, 2014; and July 23, 2015, all inquiring about the status of its money. At least some of the emails indicated delivery failure to some of the recipients, but not necessarily all of them. (App. MSJ opp., ex. 5)

Although it apparently did not share this information with Kamaludin until it filed its reply brief on the present motion, there is evidence that the government took action to consider the letters of claim in the two years after they were submitted. On April 24, 2014, the claims were apparently forwarded by the CO to a superior officer for his ratification (*see* gov't MSJ reply, ex. E). The Army suggests in its reply brief that this internal correspondence may have never been delivered due to a changed email address (*see* gov't MSJ reply at 12, n.5). The Army also alleged that it attempted to reach out to Kamaludin a few days earlier (gov't MSJ reply, ex. F), but there is no evidence that Kamaludin actually received this document.[8]

---

[7] The dollar sign was missing from the letter of claim, but it is evident that that was what Kamaludin intended and that amount is reflected in Kamaludin's complaint before the Board. *See* compl. at ¶ 5.

[8] We summarize the post-letter of claim actions by the Army in this paragraph to reflect the information presented to us by the government in its reply brief, but do not consider it to amount to material facts as discussed in the Decision section below.

8

IV.  Kamaludin Perfects its Claims and Submits its Appeals

As detailed in the earlier Senior Deciding Group opinion in this matter, Kamaludin sent an email to the CO on March 11, 2019, attempting to retroactively apply the certification language from the CDA to the letters of claim it submitted to the CO on March 16, 2013 (R4, tab 19 at 1).[9]  Three days later, without waiting further for a decision by the CO, Kamaludin submitted appeals on all three claims to the Board:  the Deh Bouchey claim was docketed as appeal number 62008; the Chenar claim was docketed as Appeal No. 62007 and the Maholic claim was docketed as Appeal No. 62006.  The appeals were then consolidated.

## DECISION

For reasons explained below, we deny the government's motion to dismiss Appeal No. 62007 because the appeal adequately states a claim for which relief may be granted,[10] while we grant the government's motion for summary judgment for Appeal No. 62006 because there are no material facts in dispute to defeat the government's assertion that the claim being appealed was submitted more than six years after it accrued and was thus outside of the statute of limitations.

I.  We Deny the Government Motion To Dismiss Appeal No. 62007 for Failure to State a Claim

A.  The Standard of Review for a Motion to Dismiss for Failure to State a Claim

Although the Board's rules do not include an equivalent to FED. R. CIV. P. 12(b)(6), we do consider motions to dismiss for failure to state a claim.  *E.g.*, *Chugach Fed. Sols., Inc.*, ASBCA No. 61320, 19-1 BCA ¶ 37,380; *Parsons Gov't. Servs., Inc.*, ASBCA No. 60663, 17-1 BCA ¶ 36,743.  Such a motion is granted when the complaint fails to allege facts "'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief."  *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *Am. Gen. Trading & Contracting, WLL*, ASBCA No. 56758, 12-1 BCA ¶ 34,905 at 171,640.  The alleged facts "must be enough to raise a right to relief above the speculative level."  *Cary*, 552 F.3d at 1376.  In addition, the "complaint must contain sufficient factual matter, accepted as

---

[9] As noted above, we overturned our prior precedent, and held the typewritten signature on this email to be an effective certification.  *See Kamaludin Slyman*, 20-1 BCA ¶ 37,694.

[10] Not in the claims, but in the complaint, is what we would characterize as a "throwaway" allegation that the way the claims were treated was a violation of the duty of good faith and fair dealing.  *See* compl. ¶ 12.  As explained below, we will throw that away.

9

true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

"The scope of our review is limited to considering the sufficiency of allegations set forth in the complaint, 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'" *IBM Corp.*, ASBCA No. 60332, 18-1 BCA ¶ 37,002 at 180,195 (citing *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014)). For our purposes, "the primary document setting forth the claim is not the complaint, *per se*, but is either the contractor's claim or the government's claim. . ." *Lockheed Martin Integrated Sys., Inc.*, ASBCA Nos. 59508, 59509, 17-1 BCA ¶ 36,597 at 178,281.[11]

> B. The Claim and Complaint Raise Facts Sufficient for Entitlement to Relief for Appeal No. 62007, but the Good Faith and Fair Dealing Allegations in the Complaint Will Have to Go

The government argues that the Chenar claim fails because the alleged breach of the contract, which was the government's making the equipment available at the end of performance at the "inaccessible" location of VSP Chenar, was something that was plainly intended by the contract. The government also argues that Kamaludin's allegations in the complaint of a violation of the duty of good faith and fair dealing as a consequence of alleged mishandling of the claim are not properly before us and do not make a claim. *See* gov't MTD at 8-11.

With respect to its first argument, the government reads the Chenar claim too narrowly. To be sure, the first paragraph, labeled "a," of the Chenar claim states that, "Due to the vigorous terrain and high threat level in the area, I was unable to recover the equipment under contract" (R4, tab 19 at 3), suggesting that the claim was based solely on the contractor's inability to deal with the location set forth in the contract. But this is the very language that the government, itself, used in its earlier December 9, 2012 memorandum, and we find it very hard to fault Kamaludin for copying it. Moreover, the second paragraph of the claim, labelled "b," is broader. It alleges that the government had made an unauthorized commitment to use the equipment until November 2012, and that the equipment was kept in VSP Chenar because "they needed the equipment there." There is also language in paragraph b stating that "no equipment could be moved to Chenar because of security" (*id.*) Reading these all together, and with a recognition that English was not the first language of the person drafting the claim and that he was attempting to utilize words that the government had previously signaled were appropriate,

---

[11] We did not explain why this is the case in *Lockheed Martin*, but since our jurisdiction is bounded by the CO's decision upon the claim before him or her, the claim, *de facto*, has a greater effect on scope of the appeal than the complaint, drafted after-the-fact, by the relevant party's representatives or attorneys.

we can see the letter as alleging (in paragraph b) that, even if it would have been practicable for Kamaludin to obtain its equipment from VSP Chenar at the conclusion of contract performance, the government expressed a need for it up until November 2012, and was unable to get other equipment there. Paragraph a, then, is more of a generalized complaint about the circumstances presented to Kamaludin (speaking also of the alleged breach of the Deh Bouchey contract), but it does not change the triable allegations in paragraph b that the government basically told Kamaludin it would keep the equipment past the time of the contract because it needed it, just as it had when it first moved the equipment from VSP Deh Bouchey to VSP Chenar.[12] The complaint, which is of secondary importance but not unhelpful, also makes the less detailed allegation that the government held equipment past the date contracted. *See* compl. ¶¶ 3-4. Hence, as far as we are concerned, the letter of claim presents facts that "plausibly suggest[] a showing of entitlement to relief." *Cary*, 552 F.3d at 1376 (citation and quotation omitted).

We cannot say the same for the one-sentence allegation contained in the complaint that the government breached the duty of good faith and fair dealing by mishandling the claim (*see* compl. ¶ 12). As the government correctly notes (*see* gov't MTD at 10), there is no claim before the CO alleging a violation of the duty of good faith and fair dealing involving the way that Kamaludin's letters of claim were handled by the government, thus we lack jurisdiction to consider it. *See, e.g., Relyant, LLC*, ASBCA No. 59809, 18-1 BCA ¶ 37,085 at 180,534 (citing *Scott Timber Co. v. United States*, 333 F.3d 1358 (Fed. Cir. 2003) (requiring claim before the Board to rest upon the same operative facts as claim before the CO to support jurisdiction). Kamaludin has submitted no response to this portion of the government's motion and we thus dismiss the good faith and fair dealing allegations for lack of jurisdiction. Since we possess no jurisdiction over the matter and it was not briefed, we need not decide whether the CO's alleged mishandling of the claim could ever constitute an independent breach of the duty of good faith and fair dealing, whatever doubts we may harbor that it could.

Thus, in accordance with the government's motion, we dismiss any portion of appeal number 62007 resting upon the breach of the duty of good faith and fair dealing. Although the government has not requested it, there is no reason to treat Appeal Nos. 62006 and 62008 any differently than Appeal No. 62007 with respect to the good faith

---

[12] Frankly, we entertain some doubt that Kamaludin was ever really expected to retrieve its equipment from VSP Chenar, especially given the government's own language in its December 9, 2012 memorandum and since, reading between the lines, it appears the government ultimately returned it at a different location rather than making Kamaludin get it. In any event, we need not address that contingency because there is no allegation from either party that, at the end of the period of performance, the government told Kamaludin that it was free to get its equipment from VSP Chenar but Kamaludin demurred because it considered it to be too difficult.

and fair dealing allegations. Hence, rather than require a new motion and response and opinion, for reasons of judicial economy, to the extent that Appeal Nos. 62006 and 62008 also include allegations of a breach of the duty of good faith and fair dealing with respect to the handling of the claims at issue in those appeals, those portions of the appeals are dismissed as well, although we will consider later arguments from Kamaludin that distinguish Appeal Nos. 62006 and 62008 on this matter, as unlikely as it appears.

## II. We Grant the Government's Motion for Summary Judgment for Appeal No. 62006

The government argues that, because the facts permitting the assertion of the Maholic claim ripened by November 30, 2012, and the claim was not certified until March 2019, it was brought outside of the CDA's six-year statute of limitations (*see* gov't MSJ). The government is absolutely correct that the CDA's statute of limitations requires the submission of a claim within six years of claim accrual. *See* 41 U.S.C § 7103(a)(4)(A); *Abozar Afzali Const. Co.*, ASBCA No. 61561, 20-1 BCA ¶ 37,674 at 182,891. It is also correct that Kamaludin did not submit a certified claim within six years of when it appears the claim accrued. Kamaludin makes a number of arguments in opposition, contending that the claim did not accrue as early as the government asserts (app. MSJ opp. at 13-15); that the March 2013 letter of claim should be considered to be certified or, at worst, defectively certified (app. MSJ opp. at 4); that the government should be estopped from arguing the statute of limitations because it had considered the letter of claim to be a claim (*id.*); and that the statute of limitations was tolled (*id.* at 5). None of these arguments, it will be seen, are persuasive.

### A. Standards for Summary Judgment

The standards for summary judgment are well established and need little elaboration here. Summary judgment should be granted if it has been shown that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A non-movant seeking to defeat summary judgment by suggesting conflicting facts "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). Nevertheless, "[t]he moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors v. United States*, 812 F.2d 1387, 1390 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

B.  The Maholic Claim Accrued by November 30, 2012

For purposes of the CDA's statute of limitations, "[p]recedent elaborates that whether and when a CDA claim accrued is determined in accordance with the FAR, the conditions of the contract, and the facts of the particular case." *Kellogg Brown & Root Servs., Inc. v. Murphy*, 823 F.3d 622, 626 (Fed. Cir. 2016) (citations omitted).  Thus, we turn to the relevant portion of the FAR, which provides that a claim accrues when "all events that fix the alleged liability of . . . the Government . . . and permit assertion of the claim, were known or should have been known."  FAR 33.201; *see also Kellogg Brown & Root*, 833 F.3d at 626; *Elec. Boat Corp. v. Sec'y of the Navy*, 958 F.3d 1372, 1375 (Fed. Cir. 2020).

On November 30, 2012, according to Kamaludin's letter of claim, the government completed its forced extension of the Maholic contract term and returned the equipment to Kamaludin.  Thus, the government's liability was fixed and Kamaludin could bring its claim.  In other words, it had accrued.  Kamaludin makes a convoluted argument that it was waiting for the government to comply with its promise to ratify the alleged unauthorized commitment and pay it in full, as it had promised, and, citing the Supreme Court's opinion in *Franconia Assocs. v. United States*, 536 U.S. 129, 144 (2002), argues that it had the right to await the government's performance before the claim accrued (app. MSJ opp. at 14-15).

Kamaludin's argument is unpersuasive.  First, it miscites the Supreme Court, which does not (contrary to Kamaludin's assertion) permit a contractor to defer the accrual of its potential causes of action.  The portion of *Franconia Associates* that Kamaludin cites is limited to the circumstances involving an anticipatory repudiation, as is particularly clear when the immediately-preceding page of that opinion is read.  *See Franconia Assocs.*, 536 U.S. at 143-44.  That is not what we are presented with here.  Better to rely upon law applicable to our situation, such as *Kellogg, Brown & Root* and *Electric Boat.  Electric Boat* is particularly instructive.  In that case, the contract included a "change of law" clause which provided that, upon changes in regulation that made the contract more expensive to perform, the contractor could seek an increase in the contract price from the government.  958 F.3d at 1374.  Regulations increasing labor requirements were, in fact, issued during contract performance and, less than six years later, the contractor began efforts to obtain compensation from the Navy.  *Id*.  There was some back and forth between the parties, with the CO ultimately refusing to provide the compensation requested.  958 F.3d at 1375.  More than six years after the change in regulation, the contractor submitted a claim to the CO.  *Id*.  In holding that the contractor had submitted its claim too late, the Federal Circuit explained that the damage done to the contractor was the change in regulation, not the Navy's failure to adjust the price.  958 F.3d at 1376-77.  We are presented with similar circumstances here:  the alleged injury to Kamaludin occurred when the government held its equipment past the time provided in the contract.  The government's failure to agree to additional payment to Kamaludin is not a separate

13

injury, thus all of Kamaludin's arguments relating to unauthorized commitments and waiting for their ratification by the government have no bearing upon our decision. Certainly, had Kamaludin submitted a claim on November 30, 2012, any argument that the claim should be denied for being premature would have been rejected as having no basis since, unlike the circumstances in *Kellogg Brown & Root*, the contract included no mandatory pre-claim procedures before assertion of the claim. 823 F.3d at 628. And if a claim *can* be brought, it has accrued. Period.[13]

## C. The Maholic Claim was not Brought Until March 11, 2019

The letters of claim, of course, were submitted on March 16, 2013, but the Maholic claim, for over $100,000, does not appear to have been certified. This is a critical issue for statute of limitations purposes because a claim that is required to be certified, but is not certified, is not a claim at all and may not be considered by the CO. *Newport News Shipbuilding and Drydock Co. v. Garrett*, 6 F.3d 1547, 1553 (Fed. Cir. 1993). Kamaludin attempted to remedy this situation by its email, after the fact, on March 11, 2019 which relied upon a typed signature on that email for the certification which we, overturning over a decade of our precedent regarding the form of signatures, permitted.[14] Kamaludin argues now that, in fact, the original letter of claim in 2013 was certified in its own way, and that, to the degree it fell short, it was merely a defective certification, subject to remedy (app. MSJ opp. at 7-10). These arguments are not persuasive.

### 1. The March 16, 2013 Maholic Letter of Claim was not Certified

The CDA requires the certification of claims "of more than $100,000." 41 U.S.C. § 7103(b). This certification is required to be "executed by an individual authorized to bind the contractor with respect to the claim" and must state that:

> (A) the claim is made in good faith;

---

[13] Relatedly and critically, Kamaludin does not explain why, if March 16, 2013 is an appropriate accrual date (as it must be because that is the date of the letters of claim which it relies upon were submitted), it could not have brought its claim just a few days earlier. Since the Maholic claim was certified on March 11, 2019, it would be precluded by the statute of limitations if it could have been brought on March 10, 2013. In fact, nothing material, affecting the ability of Kamaludin to bring its claim, happened between March 10, 2013 and March 16 of the same year, lending more support to our finding that the accrual date was more than six years prior to the date that Kamaludin certified its claim.

[14] The statute of limitations issue was not before us at that point, and we ruled only on the narrow issue of the validity of the signature.

(B)  the supporting data are accurate and complete to
the best of the contractor's knowledge and belief;
(C)  the amount requested accurately reflects the
contract adjustment for which the contractor believes
the Federal Government is liable; and
(D)  the certifier is authorized to certify the claim on
behalf of the contractor.

41 U.S.C. § 7103(b)(1)

The March 11, 2019 email from Kamaludin explicitly included the four statements required by 41 U.S.C. § 7101(b); the March 16, 2013 "letter of claim" did not. Kamaludin argues, correctly, that the law does not require an exact "parroting" of the language in Section 7101(b).  *See* app. MSJ opp. at 9 (citing *Sipco Servs. & Marine, Inc. v. United States*, 30 Fed Cl. 478, 482 (1994)).  But, as Kamaludin also correctly acknowledges, it must "clearly and unequivocally comply" with the certification requirement.  *Id.*  Indeed, the certification requirement must be accomplished by an affirmative statement simultaneously complying with all of the statutory certification requirements.  *W.H. Mosely Co. v. United States*, 677 F.2d 850, 852 (Ct. Cl. 1982); *see also Skelly and Loy v. United States*, 685 F.2d 414, 417 (Ct. Cl. 1982) (quoting *Mosely* and rejecting piecemeal certification).  This requirement is fatal to Kamaludin's argument that it implicitly complied with the certification requirement.

Kamaludin makes a preliminary argument, attempting to tie its March 16, 2013 letter to the government's November 25, 2012 request that it provide a certification for its invoices regarding the held over equipment (*see* app. MSJ opp. at 7).  But the March 16, 2013 letter of claim makes no reference to the November 2012 government request, nor does it in any other way purport to provide a certification as requested by the government.  In any event, the question before us is not how Kamaludin responded to the November 25, 2012 letter (if at all), but whether it complied with the statutory certification requirement.[15]  We review the statutorily-required components of certification below.

The first requirement in the statute is a statement that the claim is "made in good faith."  41 U.S.C. § 7103(b)(1)(A).  These words are nowhere to be found in the March 2013 letter of claim.  Kamaludin argues that it meets this requirement by words

---

[15] The government's strange inclusion of certification language in its December 9, 2012 memorandum for record does nothing to change this:  it did not come from Kamaludin; Kamaludin did not in any way adopt it; and a claim cannot be "pre-certified" in any event.  *See Oman Fischbach Int'l (Joint Venture)*, ABSCA No. 41474, 91-2 BCA ¶ 24,018 at 120,268-69.

simply stating why it was submitting the claim (app. MSJ opp. at 8).  A company acting in bad faith could say the same.

The second requirement in the statute is a statement that "the supporting data are accurate and complete to the best of the contractor's knowledge and belief."  41 U.S.C. § 7103(b)(1)(B).  Kamaludin's argument that this requirement was met rests upon its explanation of where its figures came from, namely the same prices agreed upon for the original contract (app. MSJ opp. at 8).  But, in fact, the letter of claim was completely devoid of any statement about those figures' accuracy or completeness to Mr. Slyman's knowledge or belief.

The third requirement in the statute is a statement that "the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable."  41 U.S.C. § 7103(b)(C).  Kamaludin argues that this is met by the same language that it asserts satisfies the second statutory requirement (on accuracy and completeness), namely, its explanation of the prices it utilized for calculating its claim (app. MSJ opp. at 8).  Again, this utterly fails to address the statutory expectation.  It makes no reference to accuracy or belief that the government is liable for the amount of money, except implicitly.

The final requirement in the statute is that the signer state that he or she "is authorized to certify the claim on behalf of the contractor."  41 U.S.C. § 7103(b)(D).  Again, these words, or words like them, are wholly absent from the March 2013 letter of claim.  Kamaludin argues that, by signing as "President" of Kamaludin, Mr. Slyman was representing that he had the authority to certify the claim (app. MSJ opp. at 8).  But hoping for the reader to surmise that the president of a company has the authority to submit a claim is not the same thing as affirmatively stating that the signer does.  Again, Kamaludin does not touch the statutory mark.

Finding that Kamaludin complied with the statutory certification requirements by some sort of implicit certification theory as advanced here would be contrary to the law discussed above, which requires explicit statements of certification.  Moreover, it would make the certification requirement meaningless:  as applied by Kamaludin, almost every claim could be read as implicitly being brought in good faith; every claim that had a modicum of explanation for its basis could be read as including an assertion that its numbers were accurate and that the contractor believed its figures to be what the government owed the contractor; and any signatory would be asserting his or her authority to bring the claim on behalf of the contractor (else why would they submit it?).  Although we may have refined the definition of the signature requirement in our previous Senior Deciding Group opinion in these appeals, we most certainly did not back away from the critical importance of the certification requirement to deter fraud.  *See Kamaludin Slyman*, 20-1 BCA ¶ 37,694 at 182,999; *see also Paul E. Lehman, Inc. v. United States*, 673 F.2d 352, 354-55 (Ct. Cl. 1982) (thorough discussion of genesis of

certification requirement, its anti-fraud intent, and its importance). Implicit certification is no certification and does not satisfy the purpose of this statutory requirement.

2. The March 16, 2013 Letter of Claim was not Merely Defectively Certified, but Wasn't Certified at all

Kamaludin argues that, at the very least, the claim certification was defective, entitling Kamaludin to remediate it (app. MSJ opp. at 9-10). The Federal Circuit recently weighed in on defective certification issues in *Dai Global v. Admin. of the United States Agency for Int'l Dev.*, 945 F.3d 1196 (Fed. Cir. 2019). As set forth by the statute and explained by the *Dai Global* court, when a claim certification is "defective," the agency or the Board still possesses jurisdiction to consider it, though the Board or court considering the appeal must order the defect corrected. 945 F.3d at 1198 (citing 41 U.S.C. § 7103(b)(3)). A claim that is not certified at all, however, is not subject to cure. *Special Operative Grp., LLC,* ASBCA No. 57678, 11-2 BCA ¶ 34,860 at 171,480; *CCIE & Co.*, ASBCA Nos. 58355, 59008, 14-1 BCA ¶ 35,700 at 174,816; *Baghdadi Swords Co.*, ASBCA No. 58539, 13 BCA ¶ 35,395 at 173,665.

A defective certification is defined in FAR 33.201 as "a certificate which alters or otherwise deviates from the language in 33.207(c) [(the statutory certification language, as reproduced by the regulation)] or which is not executed by a person authorized to bind the contractor with respect to the claim. Failure to certify shall not be deemed to be a defective certification."

*Dai Global* rejected an overly constrained view of what constituted a defective certification, but did not provide a means for distinguishing between a defective certification and no certification. Instead, it rejected the Civilian Board of Contract Appeals' imposition of a requirement that a defect be only a technical one and that it not be grossly negligent or fraudulent. 945 F.3d at 1199-00. Thus, even if the defects in a claim certification are not merely technical, they remain curable. *Id*. The Federal Circuit, though, did not expand upon the FAR's definition of defective, specifically declining to state whether one of the two potential certification documents (a cover letter) alone would be enough to constitute a defective certification, allowing for remedy. 945 F.3d at 1199, n.2.

Nevertheless, even without more explication, we do know that there needs to be something purporting to be a certification in order to reach the threshold of being a defective certification. Moreover, the Federal Circuit's declining to decide in *Dai Global* whether one of the documents before it was enough to be a defective certification, *see* 945 F.3d at 1199, n.2, implies that there is *some* point where a claim is considered to be lacking in certification and is not eligible to be cured. A claim without anything appearing to be a certification cannot be said to have a defective certification.

17

Here, Kamaludin asserts that its cobbled-together portions of the claim to form an "implicit certification," makes a defective certification at worst. But there is simply no certification that can be pointed to that is defective. If a contractor could assert that the certification is to be implicitly found in the entirety of the claim, albeit, in a defective way, there would be no such thing as a claim lacking in certification. That is contrary to the statutory purpose of the certification requirement discussed above and would collapse Section 7103(b) into a mere requirement that a contractor certify its claim prior to the entry of judgment by the Board or the Court of Federal Claims, rather than at the time it is submitted to the CO. That goes further than the statute permits. There being nothing we can point to as the certification of Kamaludin's claim, we have no basis to find it defective and thus remediable.

### D. The Government is not Estopped From Requiring Compliance With the Statutory Certification Requirement

Kamaludin's next argument is that, even if its claim were not certified, the CO's failure to inform it of its error, combined with Kamaludin's reliance on assurances that the claim was being considered, should estop the government from challenging the claim's lack of certification now (app. MSJ opp. at 10-12). In support of this argument, Kamaludin cites general law regarding "unclean hands," but none of the cases are specific to claims certification (*see* app. MSJ opp. at 12). There's a reason for that.

First, the certification requirement being statutory, no government official possesses the authority to waive it. *Paul E. Lehman, Inc. v. United States*, 673 F.2d 352, 356 (Ct. Cl. 1982) (CO does not have authority to waive certification requirement); *see also Newport News*, 6 F.3d at 1553 (CO has no authority over uncertified claim). And it is self-evident that what the government is powerless to do on purpose, it is powerless to do by accident or through estoppel.

In any event, any estoppel claim against the government requires the appellant prove the element of affirmative misconduct. *See Tech. Sys. Inc.*, ASBCA No. 59577, 17-1 BCA ¶ 36,631 at 178,387 (citing multiple cases). Kamaludin makes no such allegation here, thus it could not avail itself of the estoppel defense even were it available for claims certification issues, which it is not.

### E. The Statute of Limitations was not Tolled

Kamaludin's final argument against summary judgment is that the government's actions should be seen as tolling the statute of limitations since it gulled it into believing that its claim had been properly filed and was under consideration (app. MSJ opp. at 15-18). This argument fails upon consideration of just what is necessary for equitable tolling in the CDA context.

1. The Requirements for Equitable Tolling

The doctrine of equitable tolling permits the CDA's statute of limitations to be extended so long as an appellant: 1) has been pursuing its rights diligently; and 2) some extraordinary circumstance stood in the way to prevent timely submission of its claim. *Abozar Afzali*, 20-1 BCA ¶ 37,674 at 182,892 (citing *Khenj Logistics Grp.*, ASBCA No. 61178, 18-1 BCA ¶ 36,982 at 180,140 (citing *Artic Slope Native Ass'n v. Sebelius*, 583 F.3d 785, 798 (Fed. Cir. 2009) (applying equitable tolling to the CDA) and *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 755 (2016) (setting forth the elements of equitable tolling)). "The diligence required for equitable tolling purposes is 'reasonable diligence,' not 'maximum feasible diligence.'" *Holland v. Florida*, 560 U.S. 631, 653 (2010) (internal quotation marks and citation omitted). When determining diligence, "courts consider the [litigant's] overall level of care . . . in light of [its] particular circumstances." *Doe v. Busby*, 661 F.3d 1001, 1013 (9th Cir. 2011). "[T]he second prong of the equitable tolling test is met only where the circumstances that cause a litigant's delay are both extraordinary and beyond its control." *Menominee*, 136 S. Ct. at 756 (emphasis omitted). The "extraordinary circumstances" analysis asks whether the circumstances rendered "critical information, reasonable investigation notwithstanding, undiscoverable[,]" *Gould v. U.S. Dep't of Health and Human Servs.*, 905 F.2d 738, 745-46 (4th Cir. 1990), and there is no requirement that these extraordinary circumstances involve misconduct or fault of the government. *E.g.*, *Holland*, 560 U.S. at 549-50 (extraordinary circumstance involved alleged gross negligence of petitioner's own attorney).

2. No Extraordinary Circumstances Prevented Kamaludin From a Timely Filing of its Claim

Thus, we turn to the facts presented in this matter, and considered in the light most favorable to Kamaludin. Addressing the second prong of the applicable test, we find that there are no extraordinary circumstances here to justify equitable tolling. Indeed, the relatively prosaic nature of the circumstances touted by Kamaludin in its opposition to the government's motion underscores that point.

What Kamaludin argues prevented it from submitting a timely claim is the government's failure to respond to its inquiries over a number of years and the government's earlier assurances that Kamaludin would be paid. That's it. (*See* app. MSJ opp. at 17-18). What Kamaludin has explained here is why it might have thought it did not need to present a claim, not why something stood in the way, preventing it from doing so, as is required.[16] Indeed, the existence of Kamaludin's March 16, 2013 letters of claim

---

[16] The circumstances here, where Kamaludin hoped to get a positive result from the government and was even encouraged to believe such was likely and then was

completely undercuts its present allegations that something extraordinary prevented it from presenting a timely claim. And there is no reason, whatsoever, why the March 16 letter of claim here could not have been certified in 2013, instead of 2019: the government's failure to respond to the letter of claim in a timely way or its indication that it expected to grant the relief requested did not stop Kamaludin from making a timely certification. And the government's silence when presented with an uncertified claim did not render "critical information, reasonable investigation notwithstanding, undiscoverable[,]" *Gould v. U.S. Dep't of Health and Human Servs.*, 905 F.2d 738, 745-46 (4th Cir. 1990). The infirmity of its claim was plain for Kamaludin to see.

Kamaludin has not presented a material fact in dispute supporting a finding of equitable tolling.

### III. There is no Basis for Granting Additional Discovery to Kamaludin

Kamaludin's opposition to the government's motion for summary judgment asks, in the alternative, for discovery, pursuant to FED. R. CIV. P. 56(d) on three matters purportedly related to the accrual of its claims and their equitable tolling: 1) internal government correspondence regarding how the March 16, 2013 letter of claim and any ratification requests were treated; 2) information regarding alleged changes in the government email account with which Kamaludin had previously communicated with the government; and 3) information about why the government never advised Kamaludin that its claim was defective or that it had not complied with what was requested by the CO (app. MSJ opp. at 18-19). But the discovery sought could not change the result of the motion for summary judgment, thus the request is denied.

#### A. Additional Discovery in Response to a Motion for Summary Judgment is Only Granted if the Sought-For Information Would Change the Result of the Motion

Although the Board does not have its own Rule 56(d) equivalent, it is our practice to look to FED. R. CIV. P. 56 when evaluating motions for summary judgment. *See* Board Rule 7(c)(2); *Chugach Fed. Sols., Inc.*, ASBCA No. 61320, 19-1 BCA ¶ 37,314 at 181,495. Rule 56(d) provides that, when the non-movant can demonstrate by an affidavit or declaration "that, for specified reasons, it cannot present facts essential to justify its opposition" the court may take actions to remedy the situation, including deferring ruling on the motion or ordering discovery. *See* FED. R. CIV. P. 56(d).

As we explained in *Chugach*, to obtain relief under FED. R. CIV. P. 56(d), the opposing party must do more than simply argue that discovery is incomplete, "but must

---

disappointed, are not at all extraordinary in contracting, as many contractors can (perhaps ruefully) attest.

explain specifically how additional discovery will allow the party to rebut the summary judgment motion." 19-1 BCA ¶ 37,314 at 181,496 (citing *Garcia v. United States Air Force*, 533 F.3d 1170, 1179-80 (10th Cir. 2008); *Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1363-64 (Fed. Cir. 2008)). Hence, if the sought-for discovery could not change the results of the pending motion for summary judgment, there is no basis for relief pursuant to the Rule. *See Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144 (Fed. Cir. 1996)

      B.    <u>The Discovery Sought by Kamaludin Would Not Alter the Material Facts Before us</u>

Kamaludin's FED. R. CIV. P. 56(d) request demonstrates the infirmities of its approach to the motion for summary judgment and the detours that it makes (indulged somewhat by the government)[17] from the matters of import in deciding upon the statute of limitations issue.

The first issue Kamaludin wishes discovery upon is how the government internally treated its March 16, 2013 letter of claim and ratification requests. But this information would do nothing to change either the accrual date of the claim, which pre-dated the letter of claim, nor any equitable tolling of the statute of limitations since any of the government's internal discussions, unknown to Kamaludin, could not have prevented Kamaludin from taking its actions to submit a claim within the statute of limitations. The material questions for the statute of limitations are what Kamaludin did and did not do or was prevented from doing – not what somebody else could or should have done differently.

---

[17] The government's reply brief, in part, included affidavits and documents that descended into the rabbit hole of the unauthorized commitment, which Kamaludin invited it into in its opposition, and discussed just what happened to Kamaludin's requests for payment before and after the letters of claim were submitted. *See* gov't MSJ reply at 5-12. Kamaludin's sur-reply bootstraps on this government response to argue that it needs discovery to address the issues raised by the government's evidence (app. MSJ sur-reply at 4-6). We do not perceive this request to expand significantly the requests made in Kamaludin's initial brief, but see it as arguing why the government's new evidence fails to answer the questions Kamaludin earlier had. In any event, as we noted in our brief discussion of this evidence in the Facts section above, none of this information is material to the dispositive questions of whether Kamaludin's claim accrued on November 30, 2012; whether a certified claim was submitted within six years of that date; and whether extraordinary events prevented Kamludin from submitting its certified claim in compliance with the statute of limitations.

Perhaps this information is being sought in the hope of finding bad faith by the government to buttress Kamaludin's estoppel argument (Kamaludin does not say). But as discussed above, the estoppel argument fails even before we reach issues of good or bad faith.

Similarly, any change in the government's email account is also immaterial in the facts presented here. If Kamaludin had presented evidence that it had attempted to submit a certified claim to the government but that it went to the wrong email account, depending upon the circumstances, that *might* present a case for equitable tolling. *Cf. Abozar Afzali*, 20-1 BCA ¶ 37,674 at 182,892. But instead, we are presented with the government's silence in response to Kamaludin's inquiries. Silence, regardless of the cause, did not stand in the way of Kamaludin's submission of a timely claim, and Kamaludin has presented no basis, consistent with the principals of equitable tolling, for us to find, in these circumstances, information about the email account to be a material fact that would preclude summary judgment against Kamaludin.

Finally, Kamaludin has presented no argument about why the government's failure to inform it that its claim was defective should be material. Certainly, the statute of limitations accrual date is not affected by anything that happens after that date, and equitable tolling, as discussed above, is driven by extraordinary circumstances preventing the submission of a proper claim. We are aware of no legal obligation of the government to recognize or report an uncertified claim to the claimant, nor has Kamaludin pointed out any legal basis for such that would toll the statute of limitations.

In the end, none of the information sought by Kamaludin could affect the undisputed or uncontroverted material facts which entitle the government to summary judgment nor create new facts precluding it. The Rule 56(d) request for additional discovery is denied.

CONCLUSION

For the reasons discussed above, the government's motion to dismiss Appeal No. 62007 is denied, except that the good faith and fair duty aspects of the complaint which are applicable to all three appeals are dismissed; the government's motion for summary judgment upon statute of limitations grounds for Appeal No. 62006 is granted and that appeal is denied. We also deny Kamaludin's request for relief under FED. R. CIV. P. 56(d).

Dated: April 29, 2021

_____
J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

I concur

_____
RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

_____
CHERYL L. SCOTT
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62006, 62007, 62008, Appeals of Kamaludin Slyman CSC, rendered in conformance with the Board's Charter.

Dated: April 29, 2021

_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals